

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-1465-13

### THOMAS DALE DELAY, Appellant

### v.

### THE STATE OF TEXAS

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE THIRD COURT OF APPEALS
### TRAVIS COUNTY

PRICE, J., delivered the opinion of the Court in which KELLER, P.J., and WOMACK, KEASLER, HERVEY, COCHRAN, and ALCALA, JJ., joined. JOHNSON, J., filed a concurring opinion in which COCHRAN, J., joined. MEYERS, J., filed a dissenting opinion.

### O P I N I O N

The appellant was convicted of the offenses of (1) money laundering of funds of an

aggregate value of $190,000, a first-degree felony at the time,[1] and (2) conspiracy to commit

---

[1] TEX. PENAL CODE § 34.02(a)(2), (e). The offense is alleged to have occurred in 2002, at which time it was a first-degree felony to launder money of an aggregate value greater than $100,000. The money laundering statute has since been amended to raise the threshold value for a first-degree felony to $200,000. Acts 2005, 79th Leg., ch. 1162, § 2, p. 3803, eff. Sept. 1, 2005. All citations are to the provisions of the Texas Penal Code and Texas Election Code as they existed in 2002.

money laundering of the same aggregate amount, then a felony of the second degree.[2] The trial court sentenced the appellant to five years' confinement for the object offense, although it suspended that sentence and placed the appellant on community supervision for a period of ten years. The trial court sentenced the appellant to three years' confinement for the conspiracy offense and did not suspend that sentence. On appeal, the Austin Court of Appeals reversed both convictions and rendered a judgment of acquittal with respect to each, having determined that the evidence was legally insufficient to support them.[3] We granted the State's petition for discretionary review to examine its contention that the court of appeals failed to consider all of the evidence and failed to view the evidence it did consider with the proper respect for the jury's fact-finding function. We will affirm the court of appeals's judgment.

To be convicted of money laundering, the accused must be shown to have "knowingly . . . conduct[ed], supervise[d], or facilitate[d] a transaction involving the proceeds of criminal activity[,]" and the crime that generated the proceeds must generally rise to the level of a felony.[4] The appellant was convicted of having facilitated and conspired to facilitate the

---

[2]

TEX. PENAL CODE § 15.02(a), (d). Such an offense would have been a second-degree felony in 2002, since the object offense of money laundering was a first-degree felony at that time.

[3]

*DeLay v. State*, 410 S.W.3d 902 (Tex. App.—Austin 2013).

[4]

*See* TEX. PENAL CODE § 34.02(a)(2); *id*. § 34.01(1)(A). "Criminal activity" may also include an offense punishable by confinement for more than one year under the laws of another state. *Id*. §

making of campaign contributions to certain Texas candidates with funds that were tainted because they were generated under circumstances that constituted a felony-grade violation of the Texas Election Code. The appellant has steadfastly insisted, both at trial and on appeal, that the funds were not tainted, for purposes of either money laundering or conspiracy to commit the same, because, as a matter of law, the circumstances under which the funds were generated did not violate any felony provision of the Election Code.

It is axiomatic that, in gauging the legal sufficiency of the evidence to support a particular criminal conviction, reviewing courts are obliged to view all of the evidence in the light most favorable to the jury's verdict, in deference to the jury's institutional prerogative to resolve all contested issues of fact and credibility.[5] But sometimes appellate review of legal sufficiency involves simply construing the reach of the applicable penal provision in order to decide whether the evidence, even when viewed in the light most favorable to conviction, actually establishes a violation of the law.[6] The court of appeals tacitly recognized this when it repeatedly alluded to our opinion in *Williams v. State*, in which we

34.01(1)(B). That provision is not applicable in this case.

[5]
 *E.g.*, *Brooks v. State*, 323 S.W.3d 893, 899 & n.13 (Tex. Crim. App. 2010).

[6]
 *See, e.g.*, *Shipp v. State*, 331 S.W.3d 433 (Tex. Crim. App. 2011) (plurality opinion) (holding that a retail store's printed receipt falls within the catch-all of "another commercial instrument" in contemplation of the forgery statute and that the evidence was therefore sufficient to support a conviction for passing a forged store receipt); *Wright v. State*, 201 S.W.3d 765 (Tex. Crim. App. 2006) (construing a statutory provision to hold that unusable toxic substances may be included to obtain a sufficient aggregate weight of methamphetamine to sustain the conviction).

observed that, "[i]f the evidence establishes precisely what the State has alleged, but the acts that the State has alleged do not constitute a criminal offense under the totality of circumstances, then that evidence, as a matter of law, cannot support a conviction."[7] We agree with the court of appeals's ultimate conclusion that, as a matter of law, what the State has proven in this case does not constitute either of the alleged criminal offenses.

## I. BACKGROUND

### A. The Facts

At the time he allegedly committed these offenses, in 2002, the appellant was the Republican Majority Whip of the United States House of Representatives. In his capacity as Republican Majority Whip, the appellant established a congressional leadership federal political action committee called Americans for a Republican Majority ("ARMPAC"),[8] with Jim Ellis as its director. In a calculated effort to gain more Republican officeholders in the Texas House of Representatives during the 2002 election cycle, with the ultimate goal of obtaining redistricting in Texas so that more Republicans might gain seats from Texas in the United States House of Representatives, the appellant set in motion events that led to the

---

[7] *DeLay*, 410 S.W.3d at 907, 915, 916 (citing *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)).

[8] Testimony showed that "[a] leadership PAC is a Political Action Committee that many of the members of Congress . . . have" whereby "the monies that they are able to raise and put in their PACs, they can use to help other like-minded politicians across the country get elected[.]"

formation of Texans for a Republican Majority ("TRMPAC"), a Texas general-purpose political committee, with Ellis's friend, John Colyandro, as its director. TRMPAC hired two fund-raisers: Susan Lilly, who specialized in raising political donations from individuals, and Warren RoBold, whose specialty was corporate fund-raising. TRMPAC generated fund-raising brochures, expressly identifying as its mission to "help Republican candidates successfully run and win campaigns in Texas" and assuring corporate donors that, "[u]nlike other organizations, your corporate contribution to TRMPAC will be put to productive use." Indeed, "[r]ather than just paying for overhead," corporations were told, "your support will fund a series of productive and innovative activities designed to increase our level of engagement in the political arena." Among those activities promised were "[a]ctive candidate evaluation and recruitment" and "[m]onitoring of campaign progress." One solicitation flier aimed at both individual and corporate donors specifically listed among TRMPAC's activities that it would "[f]ind the best candidates and help them win[,]" and, more pointedly, "[d]irect campaign contributions in targeted races." Another promised that "[y]our support today will go directly to help Republican candidates in Texas successfully run and win their campaigns." Yet another flier—this one actually returned to TRMPAC along with a $5,000 corporate donation—directly asserted that "[a]ll contributions, whether to the PAC or individuals, will be used for direct campaign expenses." The appellant was listed as a member of TRMPAC's advisory board on most of this fund-raising literature,

although the advisory board's function was largely ceremonial.

The record suggests that RoBold enjoyed greater success raising corporate contributions than Lilly did soliciting from individuals. By the middle of September of 2002, TRMPAC had raised more than $350,000 in corporate contributions. Those funds were deposited in TRMPAC's so-called "soft money" account, out of which staff salaries and administrative expenses were regularly paid. TRMPAC also maintained a "hard money" account, into which it deposited contributions from individuals. In late August or early September of 2002, Ellis approached Terry Nelson, an officer with the Republican National State Election Committee ("RNSEC"), about the possibility of TRMPAC contributing soft money to RNSEC in exchange for RNSEC making contributions from its hard money account to Texas candidates. On September 13, 2002, Colyandro signed a blank check from TRMPAC's soft money account and forwarded it to Ellis in Washington, who then completed the check in the amount of $190,000, payable to RNSEC. On receipt, RNSEC deposited the check into its own soft money account. A short time later, TRMPAC provided RNSEC with a list of seven Republican candidates for the Texas House of Representatives and requested RNSEC to send specific amounts totaling $190,000, and in early October, the RNSEC cut checks to the campaigns of those seven candidates from its hard money account. At trial, this process was characterized by both parties as a "money swap." There was some testimony that, because the uses to which individual political contributions can be put are

more extensive than the permissible uses of corporate soft money, hard money is typically considered more valuable than soft, and that a "one-for-one" exchange of the type that TRMPAC negotiated with RNSEC was somewhat unusual. In any event, it is undisputed that RNSEC never transferred any money from its soft money account to its hard money account to cover the contributions it made to the seven Texas candidates.

Although the appellant did not testify at trial, certain statements he had made to the media over the years between the time of the indictment in 2005 and his trial in 2010 were introduced into evidence. Through those statements the appellant denied any direct participation in the money swap between TRMPAC and RNSEC, but he acknowledged that he was informed of the swap, and expressly approved of it, shortly after the fact. Indeed, it has been the consistent position of the defense throughout these proceedings that the swap was a perfectly legal exchange that did not violate the Texas Election Code. And indeed, the State does not seem to take issue with the appellant's assertions that neither TRMPAC's contribution of its excess soft money to RNSEC nor RNSEC's contributions to specific Texas candidates from its hard money account were unlawful in themselves. It was the State's principal theory at trial, nevertheless, that the prior agreement between TRMPAC and RNSEC to swap precisely $190,000 of corporate contributions from TRMPAC's soft money account for that same amount of direct candidate contributions from RNSEC's hard money account violated the Election Code, thus generating criminal proceeds for purposes of money

laundering.[9] Alternatively, on appeal and again in this Court, the State has argued that, even if the TRMPAC/RNSEC agreement did not render the $190,000 "proceeds of criminal activity" for purposes of money laundering, the corporations that contributed the money to TRMPAC in the first place also violated the Election Code, rendering the swap between TRMPAC and RNSEC a transaction involving tainted funds.

In support of this latter, largely appellate theory, the State points to testimony that it elicited from executives of a dozen corporations who described the circumstances under which they were solicited to make, and did make, the initial corporate political contributions to TRMPAC. One of those corporate executives maintained that his company had insisted in writing that their contributions be used for the administrative expenses of the general-

---

[9]

In its opening remarks during the final guilt-phase summations, the State argued:

> The moment, the moment that the decision was made to send the soft dollar check up to Washington, D.C. with the intent that it ultimately go to candidates for elective office is the moment that this money became proceeds of criminal activity, specifically, a third-degree felony.

> * * *

> This agreement, this - - this agreement with the names of the candidates and the corresponding amounts is what separates this transaction from any other swap that anyone else in the [sic] history has done. It is this agreement that makes it money laundering.

In its brief on discretionary review, as in its brief on appeal, the State has consistently characterized the agreement as an "exchange" whereby TRMPAC used soft corporate contributions to "purchase" hard money from RNSEC for use by candidates. State's Brief on the Merits at 25, 43, 45; State's Brief on Direct Appeal at 170. The State employed similar terminology during its oral argument to this Court.

purpose committee itself, and for no other purpose, in undoubted compliance with Texas law.[10] But RoBold confirmed that he did not expressly tell any of the corporate contributors that they must expressly designate their contributions for administrative uses only. Five of the corporate executives were never asked during trial whether they had expressly limited TRMPAC's use of their contributions to this purpose, though it is apparent from their demonstrated ignorance of Texas law with respect to the specific limitations on corporate contributions that they did *not*.[11] And six of the corporate executives expressly admitted on the stand that their corporate political contributions were *not* expressly limited in scope to the specific purpose of defraying TRMPAC's administrative costs.[12] Most of them maintained, however, that they had trusted or assumed that their contributions would be put to a lawful purpose and/or that they had duly consulted with their corporate legal counsel,

---

[10]

Philip Morris Companies, Inc., contributed $25,000, along with a cover letter designating that this contribution must be used by TRMPAC exclusively to help cover its administrative expenses. TRMPAC's accountant testified that another corporate donor, Lexmark International, Inc., also expressly designated that its $5,000 corporate contribution could only be put to the purpose of defraying TRMPAC's administrative costs.

[11]

El Paso Energy Services Company, Cornell Companies, Bacardi U.S.A., Inc., Cracker Barrel, and Reliant Energy made contributions of $50,000, $10,000, $20,000, $25,000, and $25,000, respectively. Both Cracker Barrel's and Reliant Energy's contributions were not deposited into TRMPAC's soft money account until October 1, 2002, several weeks after Colyandro had forwarded the blank check from that account to Ellis to hand over to RNSEC.

[12]

Five companies made corporate contributions without specifying a particular use for which they must be put: Questerra Corporation ($50,000), Westar Energy ($25,000), Diversified Collection Services, Inc. ($50,000), Sears Roebuck and Co. ($25,000), and The Williams Companies, Inc. ($25,000).

it never having been their *intention* to violate Texas law.[13]

## B. The Indictment

In a re-indictment,[14] the appellant was charged by separate counts with both the object offense of money laundering (Count II) and with conspiracy to commit money laundering (Count I). In both counts, the proceeds of criminal activity that were claimed to have been laundered derived from alleged violations of Subchapter D of Chapter 253 of the Election Code,[15] which governs corporate political contributions.

In Count II, which set out the object offense of money laundering,[16] the indictment

---

[13]

During trial, the prosecutor asserted that at least two of the corporations eventually signed diversion agreements with the Travis County District Attorney in order to avoid prosecution in which, the prosecutor claimed, they did admit to some wrongdoing. The defense hotly contested these assertions. The record shows that Sears and Roebuck, Inc., as part of an agreement with the district attorney's office whereby the indictment against it was dismissed, asserted that it had not intended to violate Texas law. According to the prosecutor, Cracker Barrel also "signed a pretrial diversion agreement accepting responsibility for having made a mistake[,]" although Cracker Barrel's legal department had vetted TRMPAC's solicitation and approved the contribution, having perceived no legal impediment at the time.

[14]

The original indictment also charged the appellant with conspiracy to violate the Texas Election Code. This Court ultimately sustained the trial court's ruling "to quash the Election Code-based conspiracy charges" on the basis of our holding that Section 15.01 of the Texas Penal Code, the criminal conspiracy provision, did not apply to offenses defined in the Election Code until legislative amendment in 2003. *State v. Colyandro*, 233 S.W.3d 870, 885 (Tex. Crim. App. 2007); TEX. PENAL CODE § 15.01. *See* note 45, *post*.

[15]

TEX. ELEC. CODE ch. 253, subch. D.

[16]

Count II of the indictment (money laundering) alleged that the appellant:

did knowingly conduct, supervise, and facilitate a transaction involving the proceeds

alleged two things of particular note. First, it expressly alleged that the particular transaction

that constituted the money laundering was the transfer of $190,000 from the RNSEC to the

seven Texas candidates. Second, it expressly identified the event that rendered that $190,000

of criminal activity that constituted an offense classified as a felony under the laws of this state, to wit, the offense of knowingly making a political contribution in violation of Subchapter D of Chapter 253 of the Texas Election Code, a felony violation of Section 253.003 of the Election Code; that the aforesaid transaction consisted of the transfer of funds of the aggregate value of $190,000 from the Republican National Committee and the Republican National State Election Committee, a nonfederal component and account of the Republican National Committee, to several candidates for the Texas House of Representatives that were supported by Texans for a Republican Majority PAC, namely, Todd Baxter, Dwayne Bohac, Glenda Dawson, Dan Flynn, Rick Green, Jack Stick, and Larry Taylor; that the defendants conducted, supervised, and facilitated the aforesaid transaction by:

(1)     negotiating with Terry Nelson, deputy chief of staff of the Republican National Committee, for an agreement, arrangement, and understanding whereby Texans for a Republican Majority PAC would make a contribution of a certain sum of money to the Republican National Committee and its nonfederal component and account, the Republican National State Elections Committee, and whereby the Republican National Committee and the Republican National State Elections Committee would make contributions to the aforesaid candidates;

(2)     providing the said Terry Nelson with certain information concerning contributions to be made by the Republican National Committee and the Republican National State Elections Committee to the said candidates, to wit, the names of the said candidates and amounts that Texans for a Republican Majority PAC suggested be contributed to each of the said candidates;

(3)     signing the check reproduced at the conclusion of this count; and

(4)     transferring funds of the value of $190,000 from Texans for a Republican Majority PAC to the Republican National Committee and the Republican National State Elections Committee;

and that the value of the funds that constituted the aforesaid proceeds of criminal activity was $100,000 or more.

the "proceeds of criminal activity" to be "a felony violation of Section 253.003 of the Election Code," and more specifically, "the offense of knowingly *making* a political contribution in violation of Subchapter D of the Texas Election Code[.]"[17] Count II did not specifically allege *who* knowingly made the political contribution that violated Subchapter D. It also did not allege, as an alternative theory of the offense, that the $190,000 sent from RNSEC to the seven candidates *also* constituted the proceeds of criminal activity by virtue of the knowing *acceptance* (that is, by TRMPAC) of a political contribution in violation of Subchapter D.[18] Thus, Count II required the State to prove the underlying Election Code violation by showing that someone knowingly *made* an unlawful political contribution under Section 253.003(a)—not that TRMPAC knowingly *accepted* one as proscribed by Section 253.003(b).[19]

---

[17] Emphasis added. *See* TEX. ELEC. CODE § 253.003(a) ("A person may not knowingly make a political contribution in violation of this chapter."); *id*. § 253.003(e) ("A violation of Subsection (a) . . . is a felony of the third degree if the contribution is made in violation of Subchapter D.").

[18] *See id*. § 253.003(b) ("A person may not knowingly accept a political contribution the person knows to have been made in violation of this chapter."); *id*. § 253.003(e) ("A violation of Subsection . . . (b) is a felony of the third degree if the contribution is made in violation of Subchapter D.").

[19] *See Curry v. State*, 30 S.W.3d 394, 404-05 (Tex. Crim. App. 2000) (when the indictment alleges a few, but not all, of the alternative statutory manner and means of committing the offense, the hypothetically correct jury charge against which the sufficiency of the evidence will be measured is limited to only those statutory theories alleged, and evidence of other statutory alternatives will not satisfy the State's burden of proof); *Geick v. State*, 349 S.W.3d 542, 547-48 (Tex. Crim. App. 2011) (when pled, a statutory definition becomes an element of the offense that the State must prove).

Count I, which alleged conspiracy to commit money laundering,[20] was somewhat less specific with respect to the object offense, as conspiracy counts are wont to be.[21]   Unlike Count II, Count I did not identify the particular money laundering transaction that the conspirators allegedly agreed to perpetrate.  However, as with Count II, Count I also did not allege the alternative theory that the proceeds derived from criminal activity by virtue of the knowing *acceptance* of a political contribution in violation of Subchapter D of Chapter 253 of the Election Code.  Thus, both counts required the State to prove the underlying Election

---

[20]

 Count I of the indictment (conspiracy) alleged that the appellant:

with intent that a felony be committed, to wit, with intent that the offense of knowingly making a political contribution to a candidate for the Texas House of Representatives in violation of Subchapter D of Chapter 253 of the Texas Election Code, a felony of the third degree, be committed, and with intent that the offense of money laundering of funds of the value of $100,000 or more, a felony of the first degree, be committed, did agree with one or more persons, namely, John Dominick Colyandro, also known as "John Colyandro," James Walter Ellis, also known as "Jim Ellis," Thomas Dale DeLay, also known as "Tom DeLay," Texans for a Republican Majority PAC, also known as "TRMPAC," and the Republican National Committee, also known as "the RNC," that they or one or more of them engage in conduct that would constitute the aforesaid offense, and the defendant, John Dominick Colyandro, the defendant, James Walter Ellis, and the Republican National Committee, did perform an overt act in pursuance of the agreement, to wit: [a lengthy list of overt acts by which TRMPAC sent the check to RNSEC in exchange for particular contributions for the seven named Texas candidates, as paraphrased by the court of appeals, *see DeLay*, 410 S.W.3d at 908].

[21]

*See, e.g., Farrington v. State*, 489 S.W.2d 607, 609 (Tex. Crim. App. 1973) ("An indictment charging a conspiracy to commit a felony need not allege the offense intended with the particularity necessary in an indictment charging the commission of the intended offense.");  *Smith v. State*, 781 S.W.2d 418, 420) (Tex. App.—Houston [1st Dist.] 1989, no pet.) (applying the holding of *Farrington* to an indictment under the current penal code).

Code violation by showing that someone knowingly *made* an unlawful political contribution under Section 253.003(a), not that TRMPAC knowingly *accepted* one as proscribed by Section 253.003(b).

## C. The Appeal

The court of appeals panel, over the dissent of the Chief Justice, held that the evidence was insufficient to establish either count of the indictment.[22] The majority opinion began with the premise that sufficient proof with respect to *both* counts, including the conspiracy count, depended upon evidence "that there was a felony criminal offense which generated proceeds."[23] With respect to the State's trial theory that TRMPAC's agreement with RNSEC to swap soft corporate money for hard money sufficed to taint the money that RNSEC sent back to the candidates, the court of appeals rejected the State's argument that this exchange constituted a violation of the Election Code.[24] Noting that it is legal for Texas corporations to make expenditures and contributions in connection with out-of-state elections, the court of appeals found nothing illegal about TRMPAC's transfer of $190,000 of corporate donations to RNSEC.[25] Nor did RNSEC violate the Election Code by sending $190,000 from

---

[22] *DeLay*, 410 S.W.3d at 916.

[23] *Id*. at 909.

[24] *Id*. at 912-13

[25] *Id*. at 913.

its own individual donor hard money account to Texas candidates.[26] Because no funds were transferred between RNSEC's two accounts, the money TRMPAC sent to RNSEC retained its character as soft corporate money, to be used for whatever legal purposes RNSEC deemed fit, while the money RNSEC sent from its hard money account to Texas candidates retained its character as individual donor money.[27] Moreover, even if the funds that TRMPAC sent to RNSEC were somehow tainted, the transaction by which RNSEC sent money to Texas candidates did not "involve" that tainted money, and therefore could not support money laundering (or even a conspiracy to commit money laundering).[28]

Nor did the majority believe that the State proved, for purposes of either money laundering or conspiracy to commit money laundering, that RNSEC's transfer of funds involved criminally tainted proceeds by virtue of the initial corporate contributions made to TRMPAC. The court of appeals held that the State's evidence failed to show that the corporations harbored the requisite intent to violate Section 253.003(a) of the Election Code, "[g]iven the testimony of the corporate representatives [of the lack of any intent to violate Texas law] and the undisputed facts that the corporations could lawfully make donations to

---

[26] *Id*.

[27] *Id*.

[28] *Id*. at 914-15.

TRMPAC and TRMPAC could lawfully transfer the corporate funds out of state[.]"[29] For this reason as well, the court of appeals held the evidence to be insufficient to support a conviction for either the object offense or the conspiracy offense.

Chief Justice Jones dissented. He opined that the jury had sufficient evidence, particularly in the form of TRMPAC's fund-raising literature, to infer that the corporate contributors were aware that TRMPAC intended to direct their contributions to candidates, in violation of Subchapter D of Chapter 253 of the Election Code.[30] In a footnote, he expressed the additional view that the agreement between TRMPAC and RNSEC to swap soft money for hard money was also enough to demonstrate an Election Code violation, opining that "[s]uch conduct appears to be an attempt to circumvent, rather than comply with, Election Code restrictions on the use of corporate political contributions."[31] Particularly in view of this disagreement among the justices below,[32] we granted discretionary review.

## II. ANALYSIS

### A. The Law: The Election Code and "Criminal Proceeds"

#### 1. Definitions

---

[29] *Id*. at 911.

[30] *Id*. at 916-19.

[31] *Id*. at 919 n.3.

[32] TEX. R. APP. P. 66.3(e).

A person commits money laundering if he "knowingly . . . conducts, supervises, or facilitates a transaction involving the proceeds of criminal activity[.]"[33] A person commits criminal conspiracy if, with intent that a felony (here, money laundering) be committed, he agrees with one or more persons that they engage in conduct that would constitute that offense, and one of them performs an overt act in pursuit of that agreement.[34] "Criminal activity" for purposes of money laundering "means any offense, including any preparatory offense, that is . . . classified as a felony under the laws of this state[.]"[35] "'Proceeds' means funds acquired or derived directly or indirectly from, produced through, or realized through an act."[36] The criminal activity, the proceeds of which are said to have been involved in the transaction that the appellant conducted, supervised, or facilitated, was a purported felony-level violation (or violations) of the Texas Election Code.

Specifically, the proceeds are said to have been corporate political contributions made under circumstances that constituted a third-degree felony under the Election Code. Under Chapter 253, Subchapter D, Section 253.094 of the Election Code, "[a] corporation . . . may

---

[33] TEX. PENAL CODE § 34.02(a)(2).

[34] *Id*. § 15.02(a).

[35] *Id*. § 34.01(1)(A).

[36] *Id*. § 34.01(4).

not make a political contribution . . . that is not authorized by this subchapter."[37] Violation

of this stricture is labeled "an offense" that is a "felony of the third degree."[38] An illegal

corporate political contribution is also a third-degree felony by virtue of Sections 253.003(a)

and (e) of the Election Code, which provide that "[a] person may not knowingly make a

political contribution in violation of" Chapter 253 of the Election Code,[39] and that making

such an illegal contribution "is a felony of the third degree if the contribution is made in

violation of Subchapter D[,]" which covers Section 253.094's limitations on corporate

political contributions.[40] A corporation "*may* make one or more political expenditures to

---

[37] TEX. ELEC. CODE § 253.094(a).

[38] *Id*. § 253.094(c).

[39] The general definitions in the Texas Penal Code apply to penal provisions outside the Penal Code. TEX. PENAL CODE § 1.03(b). Under Section 1.07(38) of the Penal Code, "person" includes a corporation. *Id*. § 1.07(38). Moreover, reading the various provisions of Chapter 253 of the Election Code together makes it evident that "person" was meant to embrace corporations. *See, e.g.*, *former* TEX. ELEC. CODE § 253.002 (repealed by Acts 2011, 82nd Leg., ch. 1009, § 6(1), p. 2557 , eff. June 17, 2011)(prohibiting "a person" from knowingly making a direct campaign expenditure, but then excepting "a corporation" from this prohibition under certain circumstances). Indeed, if the Legislature did not intend for corporations to count as "persons" for purposes of Section 253.003(a), it would not have included subsection (e), making it a felony-grade offense if the "person" violates Subchapter D of Chapter 253, governing corporations and labor organizations. TEX. ELEC. CODE § 253.003(e).

[40] TEX. ELEC. CODE § 253.003(a), (e). It is also an offense for a person to "knowingly accept" an illegal campaign contribution, under Section 253.003(b) of the Election Code. *See id*. § 253.003(b) ("A person may not knowingly accept a political contribution the person knows to have been made in violation of this chapter."). As we have already observed, however, this theory of how the corporate political contributions may have constituted the "proceeds of criminal activity" for purposes of money laundering and conspiracy to commit money laundering was not alleged in the indictment. We express no opinion regarding this theory since it is not before us.

finance the establishment or administration of a general-purpose committee."[41] A "political committee" is "a group of persons that has as a principal purpose accepting political contributions or making political expenditures[,]" while a "general-purpose committee" is a political committee "that has among its principal purposes[,]" *inter alia*, supporting or opposing unidentified candidates for public office.[42] A "political contribution" includes a "campaign contribution," which is defined, in turn, as "a contribution to a candidate or political committee that is offered or given with the intent that it be used in connection with a campaign for elective office[.]"[43] Finally, "'[c]ontribution' means a direct or indirect transfer of money, goods, or services, or any other thing of value and includes an agreement made or other obligation incurred, whether legally enforceable or not, to make a transfer."[44]

## 2. The State's Alternative Theories of "Criminal Proceeds"

In a nutshell, the Texas Election Code prohibits a corporation from making a contribution to a candidate or political committee that is offered or given with the intent that it be used in connection with a campaign. The State contends that the appellant committed

---

[41] *Id*. § 253.100(a) (emphasis added). An "expenditure" is defined as "a payment of money or any other thing of value and includes an agreement made or other obligation incurred, whether legally enforceable or not, to make a payment." *Id*. § 251.001(6).

[42] *Id*. § 251.001(12), (14).

[43] *Id*. § 251.001(5), (3).

[44] *Id*. § 251.001(2).

money laundering, and conspired to commit money laundering, by facilitating a transaction involving funds that constituted criminal proceeds in that they were derived from felonious corporate political contributions.

The State proffers two theories for what rendered the corporate political contributions felonious. At trial, the State's theory was that the appellant's general-purpose political committee, TRMPAC, illegally agreed upon a scheme with RNSEC to route corporate political contributions indirectly to candidates, in violation of Sections 253.003(a), 253.094(a), and 253.100(a) of the Election Code, which together prohibit making corporate contributions to a general-purpose committee for any purpose other than the establishment and administrative expenses of that general-purpose committee.[45] We shall call this the "agreement" theory of criminal proceeds. The State's second theory, stressed more on appeal than at trial, was that the corporate political contributions were illegal at their inception because they were made by the various corporate entities to TRMPAC, *not* as designated "political expenditure[s] to finance the establishment or administration of [that] general

---

[45] *Id*. §§ 253.003(a), 253.094(a), 253.100(a), 251.001(2), (3), (5). This Court held, in *Colyandro*, 233 S.W.3d at 885, that, at least as of 2002, Section 15.01 of the Texas Penal Code, the criminal conspiracy provision, did not apply to offenses defined in the Election Code—although the Legislature changed that by amendment to the Election Code in 2003. *See* Acts 2003, 78th Leg., ch. 393, § 2, p. 1633, eff. Sept. 1, 2003; *see also* note 14, *ante*. The State focuses on the definition in Section 251.001(2) of "contribution," which includes an "agreement . . . to make a transfer[,]" TEX. ELEC. CODE § 251.001(2), to argue that the appellant violated the Election Code regardless of the applicability of Section 15.01 of the Penal Code to the Election Code.

purpose committee[,]" as permitted by the Election Code,[46] but instead, with the specific intent that they be put to impermissible use in connection with Texas campaigns.[47] We shall designate this the "corporation" theory of criminal proceeds. We shall determine whether the evidence is sufficient to support convictions under *either* theory.

There is an additional wrinkle to iron out before we proceed: What are the theories of the money laundering "transaction" that are available to the State for sufficiency-of-the-evidence purposes? As we have already noted, Count I, which alleged conspiracy to commit money laundering, did not specify the particular transaction by which the State intended to prove the underlying object offense of money laundering. But Count II, which alleged the object offense, identified the transaction to be RNSEC's hard money contributions to the seven Texas candidates. Is the State bound to this particular transaction, at least for purposes of proving the object offense of money laundering? It is arguable that sufficiency of the evidence should be measured against any non-statutory theory of "transaction" that the

---

[46] TEX. ELEC. CODE § 253.100(a). *See Ex parte Ellis*, 309 S.W.3d 71, 88 (Tex. Crim. App. 2010) ("[I]t is . . . clear that [Section] 253.100 contemplates expenditures made by a corporation for certain purposes. A contribution with no strings attached would not qualify as such an expenditure. * * * [T]here is no such thing as a legal undesignated corporate political contribution."); TEX. ETHICS COMM'N OP. No. 132, at 2 (1993) ("[T]he corporation may make a contribution of money to the general-purpose committee, with the restriction that it be used only for permissible purposes under section 253.100.").

[47] TEX. ELEC. CODE §§ 251.001(3), 253.094(a), 253.003(a).

evidence would support, and not simply that which was alleged in the indictment.[48] Rather than definitively resolve that question today, we will simply assume *arguendo* that the evidence may *also* support the appellant's convictions based on the transaction by which TRMPAC conveyed money from its soft money account to RNSEC's soft money account, so long as the evidence establishes that this transaction was made with funds that were by that time already tainted by either of the State's theories of criminal proceeds—"agreement" or "corporate." Ultimately, we agree with the court of appeals that the appellant's convictions cannot stand because there is no possible view of the evidence that can establish that *any* transaction alleged to comprise money laundering involved the proceeds of a felony violation of the Texas Election Code, under *either* theory of criminal proceeds.

### B. Transaction One: RNSEC's Contribution to Texas Candidates

#### 1. The "Agreement" Theory of Criminal Proceeds

Presupposing that the relevant money laundering transaction is RNSEC's hard money contributions to the seven Texas candidates, the question under the State's "agreement"

---

[48] We measure the sufficiency of the evidence by the so-called hypothetically correct jury charge, one which accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant is tried. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). When the indictment alleges only one of alternative statutory definitions or elements for how the offense occurred, the State must prove the alternative that it has pled, and proof of some other alternative will not save the conviction. *Johnson v. State*, 364 S.W.3d 292, 294 n.10 (Tex. Crim. App. 2012). "[B]ut we have said also that the hypothetically correct jury charge does not necessarily have to track exactly all of the charging instrument's allegations." *Id*. at 294.

theory is whether those funds constituted criminal proceeds by virtue of TRMPAC's earlier agreement with RNSEC to "swap" TRMPAC's soft money for RNSEC's hard money. In the State's view, this prior agreement itself constituted a felonious political contribution, in contemplation of Sections 253.003(a) and (e) of the Election Code, because it was an "agreement" to make an "indirect transfer of money" "with the intent that it be used in connection with a campaign for elective office," under Sections 251.001(2), (3) and (5) of the Election Code.[49] Like the court of appeals, we disagree.

---

[49]

TEX. ELEC. CODE § 251.001(2),(3), (5); *id*. § 253.003(a), (e). Actually, it is less than clear to us that the Texas Election Code makes it a *felony* for TRMPAC to pass on corporate contributions to candidates. While it is certainly true that TRMPAC would commit a felony by knowingly *accepting* a political contributions for this purpose, under Section 253.003(b) of the Election Code, *id*. § 253.003(b), we find no provision in the Election Code making it an independent felony for TRMPAC, once it has illegally accepted such political contributions, to then pass those contributions on to candidates. The trial court instructed the jury in this case that such a transfer *was* an offense in its own right, but did so on authority of a provision in the Texas Election Code that governs political parties and their political action committees, not a non-party-affiliated general-purpose committee such as TRMPAC. In its final jury charge at the guilt stage of trial, the trial court informed the jurors:

> It is a violation of Subchapter D of Chapter 253 of the Texas Election Code for a political party *or a General Purpose political committee* to use corporate contributions in Texas at any time for purposes other than to defray the normal overhead expenses and operating costs incurred by the party *or political committee* or to administer a primary election or convention held by a party.

(Emphasis added). But this language (except for the italicized portions) derives from a completely different chapter (*not* Chapter 253, much less Subchapter D of Chapter 253) of the Election Code, which governs only political parties, not general-purpose political committees such as TRMPAC. *See* TEX. ELEC. CODE § 257.002(a) ("A political party that accepts a contribution [from a corporation] may use the contribution only to . . . defray normal overhead and administrative or operating costs incurred by the party; or . . . administer a primary election or convention held by the party.").

The closest we can find to a provision in Chapter 253 that might serve to criminalize TRMPAC's direct transfer of received corporate contributions to a candidate, apart from Section

The State does not contend that the transfer of corporate contributions from TRMPAC's soft money account to RNSEC's soft money account was, in itself, a violation of the Election Code.[50] And it is uncontested that RNSEC, in turn, never transferred this corporate money from its soft money account into its individual hard money account. Nor does the State contend that the transfer of money from RNSEC's hard money account to the Texas candidates violated the Election Code. Presumably the State would agree that, had these transactions occurred serendipitously, without any prior collusion or plan on the part of TRMPAC and RNSEC—that is to say, had TRMPAC simply decided to send its excess corporate contributions (beyond what it needed to cover its own administrative expenses) to RNSEC, which enjoyed greater flexibility in their uses, and had RNSEC made a wholly independent determination that some of its hard money could best be put to use in the form of contributions to support specific Republican candidates in Texas—then there would be

---

253.003(b)'s prohibition of the knowing *acceptance* of political contributions for that purpose, is to be found in Section 253.005. *See id*. § 253.005(a) ("A person may not knowingly make or authorize a political expenditure wholly or partly from a political contribution the person knows to have been made in violation of this chapter."). But a violation of this provision constitutes only a Class A misdemeanor, *id*. § 253.005(c), and so it cannot support a conviction for money laundering, which requires that the proceeds of criminal activity derive from a felony offense. TEX. PENAL CODE § 34.01(1)(A).

[50]

*See* TEX. ETHICS COMM'N OP. NO. 277, at 1 (1995) ("Although the restrictions on corporate political activity do not specify that they apply only to activity in connection with Texas elections, we have stated before that the clear purpose of title 15 [of the Texas Election Code, which regulates political funds and campaigns] is to regulate Texas campaigns and Texas elections.") (citing TEX. ETHICS COMM'N OP. NO. 208 (1994) (Texas Election Code does not require general-purpose committees to report political expenditures made on out-of-state campaigns and officeholders)).

no identifiable violation of Subchapter D of Chapter 253 of the Election Code. Although the evidence is clear that there was an explicit agreement to "swap" TRMPAC's soft corporate money for RNSEC's hard money, we fail to perceive how such a prior *agreement*—even an agreement entailing identical amounts (the so-called "one-for-one" swap of $190,000) and specifying particular candidates—could serve to transmute two transfers, neither of which by itself violates the Election Code, into a single transfer that *does*. In the absence of any transfer of corporate money from RNSEC's soft money account into its hard money account, the character of the monies never changed; it cannot be said that the Texas candidates ever received corporate contributions, even indirectly. Therefore, we agree with the court of appeals that the agreement between TRMPAC and RNSEC did not violate Subchapter D of Chapter 253 of the Election Code.

Moreover, even were we to disagree with the court of appeals and hold that the prior agreement *could* somehow operate to change the character of the $190,000 that RNSEC sent to the Texas candidates from hard money into corporate soft money, we still could not conclude that the evidence would suffice to establish money laundering. The reason is fairly simple: There is nothing in the record to show that the appellant *knew* that he was conducting, supervising, or facilitating a transaction *that involved the proceeds of criminal activity*. The State has failed to establish the requisite culpable mental state to prove the offenses of money laundering and conspiracy to commit money laundering.

A person commits money laundering if he "*knowingly* . . . conducts, supervises, or facilitates a transaction involving the proceeds of criminal activity[.]"[51] From a grammatical standpoint, this statutory language is patently ambiguous. Is it enough that the person knowingly conducts, supervises, or facilitates a transaction? Or must he also be "aware" of the added circumstance surrounding that conduct that makes it unlawful, namely, that the transaction he is conducting, supervising, or facilitating involves the proceeds of criminal activity?[52] How much of the ensuing statutory language is the adverb "knowingly" intended to modify? As in other instances of statutory construction in the face of this sort of grammatical uncertainty, the question boils down to "how far down the sentence" the Legislature intended for the *mens rea* requirement of knowledge "to travel."[53] We think the Legislature must surely have intended that, to commit or conspire to commit money laundering, the actor must be aware of the fact that the transaction involves the proceeds of criminal activity. Otherwise, the statute would attach a *mens rea* to nothing more than conduct—conducting, supervising, or facilitating a transaction—that is not intrinsically blameworthy. As in *McQueen v. State*, "[w]hat makes the conduct unlawful is that it is done

---

[51] TEX. PENAL CODE § 34.02(a)(2) (emphasis added).

[52] *See id*. § 6.03(b) ("A person acts knowingly, or with knowledge, with respect to . . . circumstances surrounding his conduct when he is aware . . . that the circumstances exist.").

[53] *Liparota v. United States*, 471 U.S. 419, 424 n.7 (1985) (quoting W. LaFave & A. Scott, CRIMINAL LAW § 27 (1972)).

under certain circumstances," and, in the face of a statute that is ambiguous with respect to the extent of the *mens rea* requirement, we have resolved the ambiguity in favor of applying "some form of culpability . . . to those 'conduct elements' which make the overall conduct criminal."[54]  That is how the ambiguity in Section 34.02(a)(2) must be resolved.[55]

There is no evidence in the record from which it may fairly be inferred that the appellant was *aware* that, by agreeing beforehand to send $190,000 of soft money to RNSEC

---

[54]

781 S.W.2d 600, 603, 604 (Tex. Crim. App. 1989).  *See also Liparota*, 471 U.S. at 426 ("This construction is particularly appropriate where, as here, to interpret that statute otherwise would be to criminalize a broad range of apparently innocent conduct.");  *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69, 73 (1994) (in construing a federal offense containing an ambiguity with respect to how much of ensuing statutory language the word "knowingly" was meant to modify, the Supreme Court concluded that the culpable mental state must be applied broadly, noting that, "[i]f we were to conclude that 'knowingly' only modifies the relevant verbs in [the statute], we would sweep within the ambit of the statute actors who had no idea that they were even dealing with sexually explicit material[,]" and that "the age of the performers is the crucial element separating legal innocence from wrongful conduct");  *Celis v. State*, 416 S.W.3d 419, 428 (Tex. Crim. App. 2013) (plurality opinion) ("[C]ritical to the *McQueen* analysis was that the conduct regulated by the statute . . . is an 'otherwise lawful act' that becomes criminal only under certain circumstances[.]").

[55]

This is not to say that, in order to be convicted, the actor must also be aware that conducting, supervising, or facilitating a transaction that he *knows* involves proceeds of criminal activity constitutes money laundering.  Under Section 8.03(a) of the Penal Code, "[i]t is no defense to prosecution that the actor was ignorant of the provisions of any law after the law has taken effect."  TEX. PENAL CODE § 8.03(a).  However, as we read Section 34.02(a)(2) of the Penal Code, it is an *element* of the offense of money laundering that the actor was aware of the fact that the money he is purported to have laundered was the proceeds of felony criminal activity.  The federal money laundering statute similarly requires knowledge that the funds constitute ill-gotten gains.  *See* 18 U.S.C. 1956(a)(1) ("Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity . . . .");  *United States v. Morelli*, 169 F.3d 798, 804 (3d Cir. 1999) (one of the elements of money laundering under this provision is "knowledge that the transaction involves the proceeds of some unlawful activity").  But, in order to commit the federal offense, the actor need not know that trafficking in what he knows to be ill-gotten gains constitutes money laundering.  *United States v. Sokolow*, 91 F.3d 396, 408 (3d Cir. 1996).

in exchange for RNSEC sending $190,000 of its hard money to the Texas candidates, TRMPAC had committed a violation of the Election Code. Indeed, the evidence suggests that the appellant, to the extent that he was personally involved in the agreement at all, believed that, so long as the soft money retained its character as soft money and the contributions from RNSEC to the Texas candidates came from an account into which no corporate contributions had been deposited, the agreed-to swap would not run afoul of the Election Code. In the absence of some decisional law or other authority in Texas at that time that had construed the Election Code so as to render such an agreed swap illegal under the Election Code, it cannot reasonably be concluded that the appellant was, or even could have been, aware that the transaction whereby RNSEC contributed hard money to the seven Texas candidates involved the proceeds of criminal activity. That being so, he simply was not susceptible to conviction for laundering money or conspiring to launder money.[56]

---

[56] We perceive at least two other potential bases to question the legitimacy of the State's "agreement" theory of criminal proceeds. Both questions derive from the statutory definition of "contribution" in Section 251.001(2) of the Election Code: "an agreement made . . . to make a transfer." TEX. ELEC. CODE § 251.001(2). First of all, in order for the agreement between TRMPAC and RNSEC to exchange soft money deriving from corporate contributions for hard money to be given directly to political candidates to constitute an illegal *corporate* political contribution, so as to render the later transfer of hard money from RNSEC to the seven Texas candidates a transaction involving "criminal proceeds" for money laundering purposes, must the corporations themselves be parties to that agreement? After all, unless there is a violation of Subchapter D of Chapter 253 of the Election Code, which governs *corporate* contributions, there is no felony offense upon which to predicate convictions for money laundering or conspiracy to commit money laundering. And there is no evidence in the record that the corporate contributors had any knowledge of, much less complicity in, the money swap agreement between TRMPAC and RNSEC. Secondly, does an agreement to make a transfer of money constitute a "contribution" if the recipients of the transfer—here, the seven Texas candidates—are not parties to that agreement? It is at least arguable that the "agreement" contemplated

## 2. The "Corporation" Theory of Criminal Proceeds

Continuing to entertain the presupposition that the relevant money laundering transaction is, as alleged in Count II of the indictment, RNSEC's hard money contributions to the seven Texas candidates, the evidence cannot support the appellant's convictions under the State's "corporation" theory for the same reasons that the evidence cannot support prosecuting the appellant under the State's "agreement" theory. Because this transaction did not involve the corporate contributions originally made to TRMPAC (and because the appellant was not aware, in any event, that the transaction did involve corporate contributions on account of the agreement to swap TRMPAC corporate contributions for RNSEC hard money), it is inconsequential to the sufficiency analyses whether those corporate contributions were made to TRMPAC in violation of Section 253.003(a) and Subchapter D of Chapter 253 of the Election Code. The transactions from RNSEC to the seven Texas candidates did not involve those corporate contributions. Thus, the evidence fails to establish that the transaction from RNSEC to the seven Texas candidates constituted money laundering or conspiracy under either the "agreement" or "corporation" theory of criminal proceeds.

### C. Transaction Two: TRMPAC's Contribution to RNSEC

Changing our focus to TRMPAC's transfer by check of the $190,000 from its soft

---

by Section 251.001(2) of the Election Code must be between the contributor and the recipient. There is likewise no evidence in the record to show that any of the candidates was aware of TRMPAC's agreement with RNSEC. In light of our disposition, we need not resolve these questions today.

money account to RNSEC's soft money account as the relevant money laundering event, we must still conclude that the evidence was insufficient. It is true that, unlike the transfers from RNSEC's hard money account to the seven Texas candidates, this earlier transaction *did* involve corporate political contributions that had been deposited into TRMPAC's soft money account. If these contributions were tainted because illegally made at the time TRMPAC forwarded them to RNSEC, then the jury may yet have had a rational basis to convict the appellant. For the reasons that follow, however, we ultimately reject the conclusion that the transfer from TRMPAC to RNSEC involved tainted proceeds.

### 1. The "Agreement" Theory of Criminal Proceeds

The agreement between TRMPAC and RNSEC was already in existence by the time the transaction occurred by which TRMPAC transferred $190,000 from its soft money account to RNSEC's soft money account. But, for the reasons we have already explained at length, that agreement did not contemplate a transaction involving corporate contributions at all, much less an *illegal* transfer of corporate contributions, since the agreement was for RNSEC to make the contributions to the Texas candidates from its hard money account. The proceeds were not criminally tainted on account of such an agreement. Therefore, conviction cannot be sustained predicated on TRMPAC's transfer of the money to RNSEC as the money laundering event based on the State's agreement theory of criminal proceeds. But the proceeds may yet have been tainted by the time that transaction occurred if the corporate

contributions were illegally made at their inception, and we turn finally to that question.

## 2. The "Corporation" Theory of Criminal Proceeds

As we have already observed, there are actually two provisions in the Election Code that serve to criminalize unauthorized corporate political contributions. On the one hand, Section 253.094(a) prohibits political contributions by corporations that are "not authorized by" Subchapter D of Chapter 253, with Section 253.094(c) designating such an offense a third-degree felony.[57] While Section 253.094 identifies no culpable mental state, neither does it plainly dispense with one. Under Section 6.02(b) and (c) of the Texas Penal Code, applicable to offenses defined outside of the Penal Code by virtue of Section 1.03(b), "intent, knowledge, or recklessness suffices to establish criminal responsibility."[58] On the other hand, a "person," including a corporation,[59] also commits the same level of felony (third degree) if he "knowingly" makes a political contribution that violates Subchapter D of Chapter 253, under Sections 253.003(a) and (e) of the Election Code. We do not think that

---

[57] TEX. ELEC. CODE § 253.094(a), (c).

[58] *See* TEX. PENAL CODE § 1.03(b) ("The provisions of Titles 1, 2, and 3 [including Chapter 6] apply to offenses defined by other laws, unless the statute defining the offense provides otherwise[.]"); *id*. § 6.02(b) ("If the definition of an offense does not prescribe a culpable mental state, a culpable mental state is nevertheless required unless the definition plainly dispenses with any mental element."); *id*. § 6.02(c) ("If the definition of an offense does not prescribe a culpable mental state, but one is nevertheless required under Subsection (b), intent, knowledge, or recklessness suffices to establish criminal responsibility.").

[59] *See* note 39, *ante*.

the legislature intended to create separately actionable offenses under Sections 253.094 and 253.003 of the Election Code. After all, it makes little sense to prohibit identical conduct in separate statutory provisions that carry an identical range of punishment, one of which fails to specify any culpable mental state at all but for which a culpable state is nevertheless required (and for which mere recklessness will suffice), while the other *must* be committed at least knowingly. The provision requiring knowledge would be rendered essentially superfluous under this state of affairs, which means the Legislature would have accomplished a useless thing, contrary to our usual interpretive assumption.[60] To avoid this result, we shall read the two provisions *in pari materia*, entertaining the "supposition that several statutes relating to one subject are governed by one spirit and policy, and are intended to be consistent and harmonious in their several parts and provisions."[61] Accordingly, we conclude that the Legislature must have intended to identify only one third-degree felony offense of making a corporate contribution in violation of Subchapter D of Chapter 253 of the Election Code, and that, moreover, it must have intended that such an offense be committed knowingly.

---

[60] *E.g.*, *Garza v. State*, 213 S.W.3d 338, 349 (Tex. Crim. App. 2007) ("We must presume that 'in enacting a statute, the Legislature intends the entire statute to be effective[,]' and did not intend a useless thing.") (quoting *Heckert v. State*, 612 S.W.2d 549, 552 (Tex. Crim. App. 1981)).

[61] *Azeez v. State*, 248 S.W.3d 182, 192 (Tex. Crim. App. 2008) (quoting *Cheney v. State*, 755 S.W.2d 123, 126 (Tex. Crim. App. 1988)).

Here again, however, we are confronted with a statutory provision for which it is "not at all clear how far down the sentence the word 'knowingly' is intended to travel[.]"[62] As with the money laundering statute, we conclude that the Legislature intended that conviction should depend upon proof of more than just the bare conduct ("make a political contribution"), which (while it may be subject to state regulation, within First Amendment boundaries) is not intrinsically condemnable. We hold that the State must also show that the actor was actually aware of the existence of the particular circumstance surrounding that conduct that renders it unlawful. Moreover, as written, Section 253.003(a) requires that the actor be aware, not just of the particular circumstances that render his otherwise-innocuous conduct unlawful, but also of the fact that undertaking the conduct under those circumstances in fact constitutes a "violation of" the Election Code.[63]

We are keenly aware that the Texas Supreme Court has construed a similarly worded provision of the Election Code differently. In *Osterberg v. Peca*,[64] our sister Court was called upon to interpret Section 253.131(a), authorizing civil damages for the making of

---

[62]

*Liparota*, 471 U.S. at 424 n.7 (quoting W. LaFave & A. Scott, CRIMINAL LAW § 27 (1972)).

[63]

TEX. ELEC. CODE § 253.003(a). *See McQueen*, 781 S.W.2d at 604 (noting the requirement of TEX. PENAL CODE § 1.02(4) that the Penal Code should be construed "to safeguard conduct that is without guilt from condemnation as criminal" to hold that "some form of culpability must apply to those 'conduct elements' which make the overall conduct criminal").

[64]

12 S.W.3d 31 (Tex. 2000).

campaign contributions and expenditures that violate Chapter 253.[65]  There, as here, the

question was whether the word "knowingly" in the statute modified merely the making of a

campaign contribution, or whether it also modified the statutory circumstance that the

contribution was made "in violation of" the Election Code.[66]  The majority concluded that

"knowingly" should be read to modify only the conduct, not the attendant circumstance,

pointing to language from other Election Code provisions, including Section 253.003(b),[67]

that are more explicit in assigning a *mens rea* to the circumstance surrounding conduct, as

an indication of such a legislative intent.[68]  Here, however, we are construing a criminal

provision, not a civil one.  Moreover, it is a penal provision that appears outside of the Penal

Code itself, and in construing penal provisions that appear outside the Penal Code, we have

---

[65]

See TEX. ELEC. CODE § 253.131(a) ("A person who knowingly makes or accepts a campaign contribution or makes a campaign expenditure in violation of this chapter is liable for damages as provided by this section.").

[66]

*Osterberg*, 12 S.W.3d at 37-39.

[67]

See TEX. ELEC. CODE § 253.003(b) ("A person may not knowingly accept a political contribution *the person knows to have been made in violation of this chapter*.") (emphasis added).

[68]

*Osterberg*, 12 S.W.3d at 37-39.  Four justices dissented, observing that "[t]he Court says 'knowingly' [in Section 253.131(a)] modifies only the act of spending money.  But spending money on core First Amendment speech cannot, in and of itself, be against the law—there has to be something more."  *Id*. at 67 (Enoch., J., dissenting).  Later, the dissenters continued: "And while it may be 'natural' to give the statute the reading the Court does today, it is no less 'natural,' and indeed it is grammatically sound, to take the Constitution into account and construe 'knowingly' to modify the entire succeeding phrase, including 'in violation of [the Election Code].'" *Id*. at 68.

recognized that the rule of lenity applies,[69] requiring "that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."[70] And indeed, even when construing provisions within the Penal Code, we have typically resolved ambiguities with respect to the scope of the applicable *mens rea* in favor of making sure that mental culpability extends to the particular circumstance that renders otherwise innocuous conduct criminal.[71] That the Legislature may have more explicitly assigned mental culpability to attendant circumstances in neighboring statutory provisions does not eliminate the patent ambiguity from Section 253.003(a) itself. Nor does it absolve us of the duty to ascribe a culpable mental state to the particular "statutory elements that criminalize otherwise innocent conduct."[72]

The State is correct to contend that there is evidence in the record from which the jury could rationally have inferred that the corporations that contributed to TRMPAC were aware

---

[69]

*See, e.g.*, *State v. Johnson*, 219 S.W.3d 386, 388 (Tex. Crim. App. 2007) ("We are mindful of the proposition that criminal statutes outside the penal code must be construed strictly, with any doubt resolved in favor of the accused."); *State v. Rhine*, 297 S.W.3d 301, 309 (Tex. Crim. App. 2009) ("Although the common-law rule that a penal statute is to be strictly enforced does not apply to the Penal Code [citing TEX. PENAL CODE § 1.05(a)], criminal statutes outside the penal code must be construed strictly, with any doubt resolved in favor of the accused.") (footnote and internal quotation marks omitted).

[70]

*Liparota*, 471 U.S. at 427 (internal quotation marks omitted).

[71]

*McQueen*, 781 S.W.2d at 603-04.

[72]

*X-Citement Video, Inc.*, 513 U.S. at 72.

that TRMPAC was determined to find a way to steer those contributions to the campaign coffers of specific candidates. The fund-raising literature at the very least encouraged the corporations to assume as much, and there was some testimony suggesting that RoBold, TRMPAC's corporate fund-raiser, may have not have disabused them of this notion, notwithstanding his denials.[73] But nothing in the record shows that anyone associated with the contributing corporations actually realized that to make a political contribution under these circumstances would in fact violate Section 253.003(a) (or any other provision) of the Texas Election Code. Only one of the testifying corporate executives evinced any such knowledge, and he represented one of the corporations, Philip Morris, that expressly designated that its contributions be put exclusively to the purpose of administering TRMPAC itself, so that its contribution was lawfully made. Every corporate executive who was

---

[73] RoBold testified he told the corporations only "that there is an opportunity to give corporate funds that would be utilized to help underwrite the administrative expense of TRMPAC who is also raising personal funds[,]" the personal funds, in turn, presumably for the purpose of making direct contributions to candidates. He would "normally make [it] very clear" that corporate donations would only be used for TRMPAC's administrative costs, to free up individual donations for candidate contributions. He acknowledged that the fund-raising literature emphasized TRMPAC's priority to channel contributions to candidates, but pointed out that this literature was directed at both corporate and individual contributors. He flatly denied ever having personally "hinted" to corporate donors that their contributions were "going to go to candidates." But some of the corporate executives denied that (or simply did not remember whether) RoBold expressly told them that their contributions would be limited to defraying TRMPAC's administrative costs. The corporate executive for Sears testified that RoBold did not tell him his corporate contribution could only be put to a limited use but in fact told him instead that it would be used "[t]o elect more Republicans to Congress in Texas." In its pretrial diversion agreement with the Travis County District Attorney, Sears claimed to have made its corporate "contribution on the basis of false and misleading information provided by the fundraiser that solicited the contribution[.]"

specifically asked vehemently denied any intention to violate Texas law,[74] and the State produced no evidence that any of them was actually cognizant of any illegality. The State argues that the jury was entitled to discredit these corporate disavowals of illegal intent. That may be the case, but there remains an utter lack of circumstantial evidence—evidence, for example, of covert dealings or the wholesale failure to vet the contributions through in-house corporate counsel—from which a jury might rationally infer corporate knowledge of actual unlawfulness. While the corporate contributors may have had enough information about TRMPAC's *apparent* intentions from the fund-raising literature that they were, or ought to have been, aware of a substantial and unjustifiable *risk* that their corporate contributions would violate the Texas Election Code,[75] neither recklessness nor negligence serves to

---

[74]

For example, notwithstanding Sears's pretrial diversion agreement with the District Attorney, the Sears executive maintained:

> A. I never thought I did anything illegal.
>
> Q. Still don't?
>
> A. Right.
>
> Q. And if RoBold said it was a -- it was legal, you believed him and you still believe him, right?
>
> A. Well, I -- I don't know about that. I believed it was legal at the time. I certainly did and I would never intentionally violate a campaign law at any level.

[75]

*See* TEX. PENAL CODE § 6.03(c) ("A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct . . . when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist[.]"); *id*. § 6.03(d) ("A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct . . . when

establish an offense under Section 253.003(a). On this state of the record, we cannot conclude that, at the time that TRMPAC transferred those corporate contributions from its soft money account to RNSEC's soft money account, the contributions were tainted because the corporations had made them with the awareness that to do so under the circumstances constituted a violation of Chapter 253.003(a) of the Election Code. Because the State has failed to prove that the corporate contributors harbored the requisite *mens rea* to establish an offense under the Election Code, we agree with the court of appeals that it has not established that the money conveyed by TRMPAC to RNSEC constituted the proceeds of criminal activity for purposes of money laundering or conspiracy to commit money laundering.

### III. CONCLUSION

For these reasons, we agree with the court of appeals that, as a matter of law, the State failed to prove facts to establish that the appellant committed either the object offense of money laundering or the inchoate offense of conspiracy to commit the same. Accordingly, we affirm the judgment of the court of appeals.

DELIVERED:      October 1, 2014
PUBLISH

---

he ought to be aware of a substantial and unjustifiable risk that the circumstances exist[.]").