# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00309-CR

**Dazrine Ruth Chagoya-Williams, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 274TH DISTRICT COURT OF HAYS COUNTY
### NO. CR-18-1090-D, THE HONORABLE WILLIAM R. HENRY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Dazrine Ruth Chagoya-Williams was convicted of capital murder of a person under the age of ten and was sentenced to life imprisonment. *See* Tex. Penal Code §§ 12.31, 19.03(a)(8). In three issues on appeal, she challenges the sufficiency of the evidence supporting her conviction and argues that the trial court erred by denying her motion to quash the indictment. We will affirm the trial court's judgment of conviction.

## BACKGROUND

**Relationship Between Parents and Removal of Child**

While in high school, Chagoya-Williams began dating Stevie Williams, who was a few years older than she. During their relationship, she became pregnant and gave birth to

their son Mike, and the couple got married.[1]   A few months after Mike's birth, Chagoya-Williams and Williams took him to the hospital for treatment for burns that he sustained to his genitals and to his feet purportedly during a bath.  After determining that the burns and locations of the burns did not seem consistent with Chagoya-Williams and Williams's description of how the injuries occurred, the treating physician ordered x-rays of Mike, and the x-rays and follow up x-rays a few weeks later showed that Mike had thirteen rib fractures in different states of healing. Many of the fractures were to Mike's posterior ribs, which are rare in infants because their ribs are flexible and bend before they break.

The treating physician later testified that no accidental scenarios could explain those rib fractures but that those types of fractures occur in three types of situations: "very forceful anterior-to-posterior compression of the chest," meaning encircling forces squeezing the ribcage; "when a child is thrown against a stationary object and hits the front of the chest with a lot of force," including situations where a child is in a car crash and "is ejected"; or in a "significant crush injury" where a large piece of furniture falls on a child's chest.  Mike also "had a distal ulnar classic metaphyseal fracture," which is a fracture to the forearm at the wrist. The treating physician testified that this type of injury is classically associated with abuse because the injury is caused by "a yanking of that extremity that will . . . pull off that cartilage" or by a "violently flailing extremity" when a child is thrown.  The treating physician described the injuries as consistent with "inflicted trauma" and explained that Mike did not have a genetic or congenital bone disorder that could have caused the injuries.  While Mike was being treated, the Department of Family and Protective Services was contacted, and the treating physician told

---

[1] Because Chagoya-Williams and Williams's children were minors at the time of the offense, we will refer to the children by pseudonyms.  *See* Tex. R. App. P. 9.10(a) (listing sensitive data in criminal cases).

2

Chagoya-Williams, Williams, and the Department that the injuries caused by compressing Mike's chest were "serious and potentially life threatening." When asked about the injuries, Chagoya-Williams told a family member that Mike's ribs may have been fractured when he was pulled out of the water and inadvertently grabbed too tightly.

Shortly after Mike was taken to the hospital, he was removed from Chagoya-Williams and Williams's custody and placed with her oldest sister from January 2017 to December 2017. During that time, Mike had no new bruises or other injuries. Starting in December 2017, Mike was returned to Chagoya-Williams and Williams's custody under a return-and-monitor order after they completed their family services plan. In March 2018, the Department's case was closed, and Mike was fully returned to Chagoya-Williams and Williams's custody after the Department concluded that the burns were accidental and that there was insufficient evidence to determine whether Mike's other injuries were caused by abuse and who caused the injuries. While Mike was removed from their custody, Chagoya-Williams and Williams had a daughter, Denise.

**Events Leading Up to and Following Mike's Death**

A few months following Mike's return, on July 3, 2018, when Mike was twenty-months old, Chagoya-Williams, Williams, and their children went to Williams's grandmother's home to celebrate the Fourth of July and planned to return there the following day. At that time, the family was living at Chagoya-Williams's father's home, but he was out of town that week. No one other than Chagoya-Williams, Williams, and their children were present in the home. In the afternoon of July 4, 2018, Chagoya-Williams and Williams placed their children down for a nap. A few hours later, Chagoya-Williams and Williams discovered that Mike was not

3

breathing. Chagoya-Williams and Williams called several family members before calling 911. The 911 operator directed the parents to perform CPR on Mike, but the operator never heard either parent counting breaths or compressions as directed.

Multiple police officers, firefighters, and emergency medical technicians ("EMT") responded to the 911 call, and the firefighters arrived on the scene first. The firefighters began performing CPR on Mike who was lying on a towel. Chagoya-Williams and Williams told the firefighters that Mike had been napping, that they had changed Mike's diaper, and that they noticed that Mike was not breathing. The firefighters noticed bruising on Mike's forehead and ribs, and one of the firefighters testified that the bruising on the ribs was not normal, was not caused by CPR, and appeared circular as if made by a hand. The firefighter related that Mike's body was stiff, meaning that rigor mortis had set in or was starting to set in. The firefighter explained that rigor mortis is a sign of obvious death, so he stopped performing CPR. The firefighter did not see Chagoya-Williams cry and described her as "very apathetic as to what was going on" and as not seeming to be "upset" or "scared"; in contrast, the firefighter stated that Williams appeared "very upset" and "very scared." Although the firefighter testified that Williams said he was sorry, the firefighter thought he may have just been grieving.

Another firefighter confirmed that Mike "was kind of stiff" and noticed that his jaw was more clenched than it should have been, meaning that Mike had been dead for some time, and that he was cold, indicating that he had been losing body heat for a while. The firefighter also noticed that Mike was wet and remembered that Williams said that he had given Mike a bath. The firefighter described the bruises on Mike as resembling fingermarks. Multiple EMTs noticed the stiffness and bruises resembling handprints, and one described Williams as upset but described Chagoya-Williams as distant, as not upset, and as not having any emotional

4

reaction. The same EMT noticed that Mike's hair was wet and that Mike appeared clean. Another EMT talked with Chagoya-Williams and Williams, and Chagoya-Williams stated that she placed the children down for a nap at 2:30 p.m. and noticed that the children seemed fine when she went to check on them later. Williams told the EMT that he found Mike not breathing around 6:00 p.m. The EMT described Williams as hysterical but cooperative, but the EMT said Chagoya-Williams showed no emotion and had no reaction when told that nothing could be done to save Mike. The EMT also described rigor mortis as the stiffening of the muscles and joints occurring one to six hours after death and said it usually reaches the limbs within three hours.

One of the responding police officers talked with Chagoya-Williams, who told the officer that she put Mike down for a nap at 2:30 p.m., that Mike had been running around before his nap, that she did not know what happened to him, and that Williams went to the room to wake up Mike and found him not breathing. The officer described Chagoya-Williams as calm but also related that she cried at certain times and rushed into the house after mistakenly believing one of the firefighters said Mike was alive. The officer stated that Williams was hysterical.

Another police officer responding to the scene described Chagoya-Williams as having "a normal, everyday demeanor" and as acting as if nothing out of the ordinary happened except when she mistakenly believed someone said Mike was alive. Chagoya-Williams told the officer that Williams and her both put the children down for a nap, went to check on Denise when she woke up, and noticed that Mike was not breathing. The officer also noticed a "brownish, red-type substance" on the towel near where Mike's face had been lying and on the sheets in Mike's crib.

5

One of the police detectives assigned to the case arrived on the scene that night after Mike had been pronounced dead and met with Chagoya-Williams, who was not showing any emotion and was not upset or crying. At one point, Chagoya-Williams had "a little emotion" talking about Mike but was not upset or crying to the same degree as Williams. During the detective's conversation with her, Chagoya-Williams stated that the children had already been bathed before they went down for a nap, that Williams went to check on the children at 6:00 p.m., and that she immediately called 911 after seeing that Mike was not breathing. Chagoya-Williams informed the detective that Williams tried to perform CPR and that she tried to use a nebulizer treatment to help Mike breathe. The detective noticed that there was a wet pair of men's underwear in the house.

Another police detective reported that Chagoya-Williams cried when Mike was taken away by the funeral home. The detective met with the family a few days later, and Williams said something "otherworldly" happened to the children and that "demons" and "evil" hurt the children. Further, the detective learned through the investigation that Williams had another child with another woman while married to Chagoya-Williams and that Chagoya-Williams's mother confirmed that she knew about the other child before the detective discovered the information.

On the day after Mike died, Chagoya-Williams talked with her other older sister. In that conversation, she made statements that the sister considered to be strange such as stating that Mike communicated with her through the baby monitor after he died to tell her that he was fine. Her sister also noticed that Chagoya-Williams was not crying and acted completely normal when discussing the incident, and the sister noted that Chagoya-Williams started talking about whether Mike had brittle bone disease even though no report on the severity of Mike's injuries or

6

the cause of his death had been released at that point. Her sister related that Chagoya-Williams only became upset when the sister said that her story about what happened did not make sense. During that conversation, Chagoya-Williams also angrily expressed that her neighbors better not say anything to her about the incident. On the following day, two days after Mike's death, Chagoya-Williams used a phone with a blocked number to call her sister and ask her to lie and tell the Department and the police that Mike "was a rough boy" if they called for a statement. After her sister did not agree to make the statement, Chagoya-Williams and Williams blocked her on Facebook, and Chagoya-Williams did not talk to the sister again.

**Investigation by the Police and Arrest of Chagoya-Williams**

After the funeral home removed Mike's body, the body was taken to a forensic pathologist who performed an autopsy. The pathologist noted that Mike was underweight and small for his age with a chest that was seven inches in length from side to side. Further, he had a large bruise on his entire forehead, a bruise between his eyes, and several large areas of bruising on his chest and back that varied in age with some being "very acute." When examining the bruising on the chest and back, the pathologist reasoned that it could have been caused by hands. In addition, Mike had a tear inside his mouth, which was caused by blunt force trauma and resulted in "a large amount of hemorrhage." Regarding internal injuries, the pathologist noticed that there was bleeding under the bruises on the chest; on the top side of the diaphragm, which was caused by blunt trauma or stretching occurring near the time of Mike's death; around the pancreas; and on the top and back of his head, which was caused by blunt trauma.

Additionally, Mike had old, healed rib fractures and new ones in the early stages of healing. Further, the pathologist explained that it would take "quite a bit of pressure and

7

deformity of the ribcage" to break an infant's rib because an infant's ribs are so pliable. Moreover, the pathologist observed that Mike's brain was very swollen after having been deprived of oxygen and that Mike had a fresh and large skull fracture on the back of the head. Additionally, the type of bruising observed was common in child abuse, and the differing ages of the bruises indicted that the injuries were "done in a repetitive fashion, always in the same fashion." The pathologist explained that rigor mortis is more apparent in muscles in the jaw, legs, and arms and fully sets in ten to twelve hours after death and that a clinched jaw indicates that a person has been dead for a couple of hours at least.

When making her conclusions, the pathologist determined that Mike "died from hypoxic encephalopathy due to asphyxia type of injury by chest compression" and showed "evidence of prior blunt force traumatic injuries." In other words, the pathologist explained that Mike "was prevented from breathing by chest compression . . . that le[]d to deformation of the chest by the compression and that stretched the diaphragm." The pathologist determined that "this was a homicide," that the injuries were consistent with child abuse and inconsistent with normal infant activity, and that Mike could have been revived if the compression had stopped instead of going on for an extended time. The pathologist related that Mike had no congenital bone abnormalities and that if he had brittle bone disease, he would have but did not have fractures throughout his body. Additionally, the pathologist explained that the liquid found on the towel and in the crib was likely "purge fluid," which is blood that pools in the lungs, bubbles into the trachea, and exits the mouth and nose after a person dies.

Contemporaneous with the funeral home taking Mike's body, the Department removed Denise from Chagoya-Williams and Williams's custody and transported her to the hospital. The same physician who examined Mike over a year earlier also examined Denise.

8

The physician noticed that Denise had a bruise on her outer ear and multiple bruises on her chest and explained that an injury to the outer ear is a "highly specific injury for child abuse because it just almost never happens or rarely happens accidentally" and is unlikely to happen because the outer ear is cartilage and, therefore, soft and flexible. That type of injury can be caused by "very forceful brunt trauma to that area and pinching, grabbing, [and] pulling of the ear." Denise also had multiple bruises on her chest, a metaphyseal fracture on her proximal left humerus where part of the cartilage for her left upper arm bone had been ripped off, a skull fracture, a laceration to one of her kidneys caused by blunt trauma, bleeding in her spinal column, damage to her heart, and rib fractures in different states of healing, meaning that some of the injuries were days old and some were weeks old. A follow-up x-ray revealed additional rib fractures that were too new to show up on the first x-ray on the day Mike died and showed that Denise had over twenty rib fractures. The physician explained that Mike and Denise had "evidence of the same mechanism of trauma being that violent, aggressive squeezing of the chest leading to rib fractures and internal injuries" as well as metaphyseal fractures.

As part of their investigation, the police obtained a search warrant and obtained the phone records for Williams's and Chagoya-Williams's phones and the phone records of some of their relatives. The phone records showed that Chagoya-Williams called 911 at 6:14 p.m., that Williams called his mother at 6:02 p.m. and had a conversation that lasted nearly five minutes, that Chagoya-Williams called her mother and talked for two minutes, and that Williams's mother then called Williams back at 6:08 p.m. and talked for twenty-eight seconds. There was a twelve-minute gap between Chagoya-Williams's and Williams's calling their family members and her calling the police. Further, the phone records showed that seven days after Mike died, Chagoya-Williams's and Williams's phones were used to block family members on

9

their Facebook profiles, including her father and older sister. Photos and videos of Mike and Denise on Williams's and Chagoya-Williams's phones taken between when they obtained custody of Mike and when Mike died showed bruises and other injuries to Mike's right eye, forehead, chin, lip, left cheek, ear, leg, left eye, and right cheek and showed injuries to Denise's right eye, left eye, and left leg. Chagoya-Williams was present in some of the photos and videos showing injuries to the children. One video shows Williams striking both children with a cell phone, but the officer reviewing the video described the strike as not "overly hard."

Moreover, the records showed that Chagoya-Williams performed the following internet searches on her phone before Mike died: "what does it mean if your eye bleeds," "red eye and lump," "bleeding eye and lump," "[h]ow to induce sleep paralysis," "swollen eyes," and "[b]lood coming out of ear with tubes." Regarding the day after Mike died, the records showed the following text exchange between Chagoya-Williams and Williams:

[Chagoya-Williams]: My poor mama is so sad. Are you okay?

[Williams]: Yes. You?

[Chagoya-Williams]: Eh. I'd be better laying with all three of my babies.

In a prior text exchange, Chagoya-Williams stated that Williams had ignored her, been rude to the children, and slammed things. Williams expressed in a text message disappointment that the children did not like him as much as they liked Chagoya-Williams and that he got angry and left the home, but later text messages indicated that the situation had improved. Both Chagoya-Williams and Williams expressed frustration with having to parent the children.

On July 23, 2018, the police arrested Chagoya-Williams and Williams. When a police officer arrested Chagoya-Williams, she acted "emotionless" on the way to jail even though it had only been nineteen days since Mike died.

**Motion to Quash and Trial**

Following her arrest, Chagoya-Williams was charged with capital murder. She filed a motion to quash the indictment in December 2021, and the trial court denied the motion. During the subsequent two-week trial, witnesses recounted the above events and provided additional testimony regarding the relationship between Chagoya-Williams and Williams and regarding Chagoya-Williams's testimony that she gave during a parental-rights-termination proceeding addressing Williams's and her rights to Denise. The State called the following witnesses: the 911 operator, two firefighters who responded to the 911 call, two EMTs who responded to the scene, six police officers who responded to the scene or participated in the investigation, the Department's conservatorship specialist involved in the removal of Mike from Chagoya-Williams and Williams's custody, the Department conservatorship specialist involved in Denise's case, Williams's grandmother, Williams's mother, Chagoya-Williams's oldest sister who became Mike's guardian after his removal, Chagoya-Williams's father, her other older sister, her mother, her stepfather, Denise's current guardian, a pediatric nurse practitioner who examined Mike during scheduled check-ups, the forensic pathologist who performed an autopsy on Mike, and the doctor who treated and examined Mike for his injuries before his removal and who treated and examined Denise after Mike died.

Williams's grandmother denied ever seeing any injuries to Mike or Denise on the day before the incident and testified that Williams called her on the phone, sounded upset, and

11

told her that Mike had died. Williams's grandmother related that Williams told her that he called 911 before he called her. Williams's mother testified that the children were fine the day before the incident. Although Williams's mother recalled that she did not see any injuries or any "out-of-the ordinary bruises" on Mike, she did remember asking Williams about a prior injury to Mike's eye because it concerned her. Williams's mother also explained that she had never seen Chagoya-Williams harm her children and that Williams had a temper "[w]hen it comes to his family."

Chagoya-Williams's oldest sister who was Mike's placement for a time testified that she saw a bruise near Mike's eye after Mike was returned to Chagoya-Williams and Williams's custody. Further, her oldest sister related that Mike had no health issues or injuries while in her custody. When describing her relationship with Chagoya-Williams, her oldest sister related that she used to be close to Chagoya-Williams before she started dating Williams but that changed when Williams started to control how she acted and what she said. Additionally, her oldest sister recalled that although she had been Mike's guardian for months, Chagoya-Williams did not allow her to see Mike after regaining custody of him except a few times and would make excuses for why the sister could not see Mike or Denise.

Chagoya-Williams's father testified that Williams, she, and the children lived with him, that he did see some bruises on Mike's face during that time, that he asked what caused the bruises, that she told him that the bruises happened when Mike slipped or fell, that he saw at one point that Mike's eye was red, and that he observed light bruising on Denise. Further, her father related that he never saw any behavior suggesting that Williams and she were not being good parents. Her father stated that he was told by a relative that Williams "ripped" Mike out of a highchair, but he explained that he did not personally observe that. Regarding the day of

12

Mike's death, her father recalled that she called him and said that Mike was not breathing and called again later and said that Mike had died. When describing the phone calls, her father said that she seemed upset and denied knowing what happened.

Chagoya-Williams's other older sister related that after Mike was returned to Chagoya-Williams and Williams's custody, she noticed that Mike had a black eye and later noticed an abrasion above Mike's lip, but her sister explained that Chagoya-Williams provided explanations for the injuries that seemed plausible. Her sister testified that she used to be close with Chagoya-Williams but that their relationship fell apart after Chagoya-Williams began dating Williams. Her sister related that Mike did not seem to be scared of Chagoya-Williams and that Chagoya-Williams seemed genuinely upset when she said Mike was not breathing. When describing Chagoya-Williams's relationship with Williams, her sister testified that Williams had control over the relationship and decided to whom they would talk.

Chagoya-Williams's mother testified that she remembered seeing "normal" bruises on Mike's forehead and cheek after he was returned to Chagoya-Williams and Williams's care. Further, her mother related that the explanations given for the injuries seemed reasonable. Additionally, her mother remembered seeing bruises on Denise's ribs. When discussing the events leading to Mike's removal, her mother stated that Williams admitted that he caused Mike to get burned. Regarding the day of the incident, her mother explained that Chagoya-Williams called her stepfather and informed him that Mike was not breathing and that her stepfather told her to call 911. Further, her mother explained that she learned that Williams had another child that he fathered while married to Chagoya-Williams and that her mother learned of the child from one of the investigating detectives and one of her husband's relatives; however, her mother testified that Chagoya-Williams did not know about the child until after

13

Mike died. Regarding Williams, her mother testified that she went to jail to visit him and that he said that Chagoya-Williams did not belong in jail. Her mother explained that she told the police about Williams's statement, but the detective denied that her mother informed the police of William's claim that Chagoya-Williams did not belong in jail.

Additionally, Chagoya-Williams's stepfather related that he saw bruises on Mike's forehead and arm after he was returned to Chagoya-Williams and Williams's custody and saw a bruise on Denise's forehead. Further, her stepfather testified that he would babysit Mike and noticed that Mike would act scared when Chagoya-Williams and Williams returned to the house and acted like he did not want to go with them, but her stepfather explained that Mike's reaction was mostly aimed at Williams. Regarding the day of the incident, her stepfather testified that Chagoya-Williams called him before calling 911; "was, like, hysterical a little bit"; said that Williams and she put Mike down for a nap; and said that they found Mike unresponsive and not breathing.

In addition to discussing the investigation, one officer testified that he did not see any implement near Chagoya-Williams that she could have used to kill Mike and that he did not find evidence that she promoted or assisted anyone in killing Mike. Another officer explained that when he talked with Williams, Williams did not indicate that Chagoya-Williams had done anything wrong to Mike.

During the testimony of the officer who searched through the images and videos on Chagoya-Williams's and Williams's phones, recordings of Chagoya-Williams and Williams that they posted on Facebook after Mike was returned to their custody were admitted into evidence and played for the jury. On one of the recordings, Chagoya-Williams claims that the Department and treating physicians had orchestrated a scam regarding Mike's injuries to make

14

money. The officer testified that no one he interviewed ever observed Chagoya-Williams hit either one of her children and that none of the seized images or videos showed Chagoya-Williams inflicting an injury on either child. Additionally, the officer admitted that he did not know whether Chagoya-Williams, Williams, or both hurt Mike, but he also testified that they were the only ones there besides Denise. Further, the officer explained that Mike was injured while in the custody of Chagoya-Williams and Williams before his removal, that Mike did not suffer any injuries while out of their custody, and that Mike started showing visible injuries when he was returned to their custody.

Another investigating officer testified regarding testimony that Chagoya-Williams gave during the termination proceeding in which she explained that she had been taught through her Department services to call 911 if there was a life-threatening emergency; that she had been informed that Mike's prior injuries were severe and not accidental; that she was the primary caregiver for Mike; that no one had unsupervised visits with the children 30 days before Mike died; that no one other than Williams, she, and their children were home when Mike died; that she did not notice any bruises on either child on July 4, 2018, before they went down for their nap; that Williams and she both checked on the children together when they slept; that Williams found Mike unresponsive; that Mike's body was cold; that Williams got into the tub with Mike to run water over him; that she called 911 when Williams got into the tub but did not mention to the 911 operator that the child was in the tub or that she subsequently tried to give Mike a nebulizer treatment; that she could not get Mike's mouth to open; and that neither Williams nor she could have inflicted the injuries. The officer further related that no witness that he interviewed indicated that Chagoya-Williams ever injured Mike or assisted Williams in harming Mike.

15

During the cross-examination of Chagoya-Williams's stepfather and her older sister who had not had custody of Mike, they both testified that Chagoya-Williams was not prone to violence and was patient with children. Similarly, when presenting her case, Chagoya-Williams called her aunt, her uncle, a cousin, and a family friend, and they all testified that she was a peaceable person and was patient with children. Chagoya-Williams also called Denise's current guardian who testified that Denise would reach out for his wife when he held Denise and would cry when he moved too quickly, but the guardian explained that Denise spent more time with his wife than him and was probably initially nervous about being in a strange place. Finally, Chagoya-Williams called the victims services coordinator who responded to the scene on the night in question, and the coordinator explained that Chagoya-Williams would cry at certain points but seemed calm otherwise and described both reactions as common and normal when someone is grieving. The coordinator related that she heard Chagoya-Williams say to Williams, "You did this, didn't you," but admitted that she did not know what Chagoya-Williams was referring to. Moreover, the coordinator recalled that Williams appeared scared and that Chagoya-Williams and Williams were sitting close together and providing "some comfort" to each other.

After considering the evidence presented at trial, the jury found Chagoya-Williams guilty of capital murder, and the trial court sentenced her to life imprisonment. She appeals her conviction.

## DISCUSSION

In her first issue on appeal, Chagoya-Williams asserts that the trial court erred by denying her motion to quash the indictment because the indictment did not set out the particular

manner and means by which she allegedly committed the crime of capital murder. In her second issue, she argues that the trial court erred by denying her motion to quash the indictment because the indictment did not allege that she could be deemed criminally responsible as a party to the offense. In her final issue, she contends that the evidence was insufficient to support her conviction. Because her sufficiency claim could result "in greater relief than h[er] other issue[s]," we address that claim first. *See Medina v. State*, 565 S.W.3d 868, 873 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd).

**Sufficiency of the Evidence**

"Evidence is sufficient to support a criminal conviction if a rational jury could find each essential element of the offense beyond a reasonable doubt." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In making this determination, "[w]e view the evidence in the light most favorable to the verdict and consider all of the admitted evidence, regardless of whether it was properly admitted." *Id*. "The jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses." *Id*. "Juries can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial," *id*., and are "free to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence," *Eustis v. State*, 191 S.W.3d 879, 884 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525-26 (Tex. Crim. App. 2012).

Appellate courts must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). Appellate courts also must bear in mind that "direct and circumstantial evidence are treated equally" and that "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "can be sufficient" on its own "to establish guilt." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). Furthermore, reviewing courts "measure the sufficiency of the evidence by the so-called hypothetically correct jury charge, one which accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant is tried." *See DeLay v. State*, 465 S.W.3d 232, 244 n.48 (Tex. Crim. App. 2014). The evidence is legally insufficient if "the record contains no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" or if "the evidence conclusively establishes a reasonable doubt." *Kiffe*, 361 S.W.3d at 107 (quoting *Jackson*, 443 U.S. at 320).

Under the Penal Code, an individual commits the offense of capital murder "if the person commits murder as defined under Section 19.02(b)(1)" and "the person murders an individual under 10 years of age." Tex. Penal Code § 19.03. Under subsection 19.02(b)(1), a person commits murder if he "intentionally or knowingly causes the death of another." *Id.* § 19.02(b)(1). Moreover, as specified in the jury charge in this case, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id.* § 7.01. "A person is criminally responsible for an offense committed by the conduct of another if . . . acting with

intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense," or "having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent commission of the offense." *Id.* § 7.02(a)(2). "To prove the intent-to-promote-or-assist element, the State must show that it was the defendant's conscious objective or desire for the primary actor to commit the crime." *Metcalf v. State*, 597 S.W.3d 847, 856 (Tex. Crim. App. 2020). When reviewing the record for evidence of intent, appellate courts look to events occurring before, during, or after the offense. *Id.* A jury is not required to unanimously agree whether a defendant was a principal actor or a party to the offense. *Leza v. State*, 351 S.W.3d 344, 357 (Tex. Crim. App. 2011).

When presenting this issue, Chagoya-Williams asserts that the evidence was insufficient to establish that she "had intent to cause the death of the child, either acting alone or as a party by aiding and abetting." Stated differently, she argues that the evidence did not show that at the time of the offense the parties were acting together with each contributing some part toward the execution of their common purpose or that she had the specific intent to promote or assist in the commission of the offense. Next, she asserts that there was no evidence that she engaged in any acts or omissions in furtherance of Williams's intent to cause Mike's death. When discussing the evidence, she highlights that a video of Williams's striking the children was discovered on his cell phone; that one of the individuals responding to the scene heard her state to Williams that he "did this, didn't you"; that Williams's text messages showed his "narcissistic concerns that the children" liked her more than him; that a witness testified that Williams had forcefully yanked Mike out of a highchair; that witnesses testified that Williams was controlling; and that the evidence showed that Williams engaged in sexual activity with Chagoya-Williams

when she was younger than eighteen years old. In contrast, she emphasizes that no witness testified that she displayed any violence towards any children, including her own, and argues that the evidence did not "prove any acts she committed upon the children." Further, she argues that evidence presented at trial established at most that she was guilty of criminally negligent homicide and that this Court should either reverse her conviction and render a judgment of acquittal or reform her conviction and remand for a new punishment hearing if we determine that the evidence is sufficient to establish that she committed the offense of criminally negligent homicide.[2]

The State's theory was that Mike was killed by someone wrapping his or her hands around his chest and compressing or squeezing his chest to the point that he could not get oxygen to his brain, that the compression was applied long enough to result in his death, that he

---

[2] When presenting her sufficiency claim, Chagoya-Williams also asserts that the evidence was insufficient because the jury charge did not incorporate into the application paragraph instructions regarding the law of parties. However, when examining the sufficiency of the evidence, appellate courts measure the evidence against a hypothetically correct jury charge. *See Delay v. State*, 465 S.W.3d 232, 244 n.48 (Tex. Crim. App. 2014). To the extent that she is presenting a jury-charge-error complaint, that issue is multifarious. *See Davidson v. State*, 249 S.W.3d 709, 717 n.2 (Tex. App.—Austin 2008, pet. ref'd) (explaining that issue containing "more than one specific ground of error is a multifarious one" and that appellate court "may refuse to consider it"). Moreover, her brief points to no supporting authority for that proposition. *See* Tex. R. App. P. 38.1(i) (setting out requirements for briefs); *see also Jessop v. State*, 368 S.W.3d 653, 681 (Tex. App.—Austin 2012, no pet.) (concluding that complaints were inadequately briefed because appellant did not make argument or cite authority). In any event, "a general reference to the law of parties in the application paragraph is sufficient and is not error when the defendant does not object and request a narrowing of the specific statutory modes of conduct that constitute party liability" in the application paragraph. *Vasquez v. State*, 389 S.W.3d 361, 368 (Tex. Crim. App. 2012) (internal footnotes omitted). Furthermore, she did not object to the alleged omission or request a narrowing during the charge conference, and the application paragraph directly referenced the abstract definitions by specifying that she could be found guilty based on "her own conduct or as a party to the offense as described above." *See Chatman v. State*, 846 S.W.2d 329, 332 (Tex. Crim. App. 1993) (determining that application paragraph incorporated law of parties and applied law of parties to facts of case by stating that defendant "either acting alone or as a party, as that term has been defined").

20

was then placed back in his crib and left there, and that Chagoya-Williams either caused the death or aided Williams in causing it.[3]

The medical testimony established that Mike's injuries were caused by forceful compression of the chest by surrounding forces squeezing the ribcage, that there were no accidental scenarios that could have caused the injuries, that the injuries were not caused by performing CPR, that death would have resulted within four to five minutes, that he had bruising on his diaphragm caused by blunt trauma in the hours leading up to his death, that the injuries inflicted on him in 2017 while he was in Chagoya-Williams and Williams's custody were the same type of injuries that later resulted in his death, that Mike and Denise both had injuries that were inflicted over a period of time and were consistent with child abuse, and that a parent would have noticed when the injuries were inflicted because the child would be in pain and crying. In addition, the physician who treated Mike in 2017 before his removal explained to Chagoya-Williams that the compression injuries he sustained were serious and could result in his death if repeated.

Chagoya-Williams testified during the termination proceeding that she primarily cared for Mike on the day in question, that no one other than Williams and she were around the children unsupervised in the 30 days leading up to the incident, that no adults other than Williams and she were in the home during the week before the incident, and that both Williams and she checked on the children together when they were napping that day. Although she previously testified and told investigating officers that Williams found Mike unresponsive shortly before they called 911, testimony was presented at trial from which the jury could have

---

[3] Williams was also convicted of capital murder, and this Court recently affirmed his conviction. *See Williams v. State*, No. 03-21-00536-CR, 2023 WL 4214960 (Tex. App.—Austin June 28, 2023, no pet.) (mem. op., not designated for publication).

21

reasonably inferred that Mike died well before they called 911 given that he was already showing signs of rigor mortis when the first responders performed CPR and given that some of the witnesses described Mike's body as being cold. The jury could also reasonably infer that she was present when Mike was injured and that she was the person who injured him either alone or by aiding Williams. *See Keith v. State*, No. 09-16-00166-CR, 2017 WL 6210865, at \*6-8 (Tex. App.—Beaumont Dec. 6, 2017, pet. ref'd) (mem. op., not designated for publication) (concluding that evidence was sufficient to support defendant's conviction for capital murder where he interacted with child victim around time of child's death even though defendant was not only person at home and someone else could have interacted with child after he did).

In sufficiency reviews, appellate courts consider evidence regarding "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Hooper*, 214 S.W.3d at 13 (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)). "Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt." *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

In this case, first responders noticed that Mike had been placed in a clean diaper and had wet hair, and the police found wet men's underwear in the home. Further, Chagoya-Williams previously testified during the termination proceeding that she had already bathed Mike before placing him down for a nap, that Williams placed Mike in the bathtub after finding Mike unresponsive and before calling 911, and that she did not tell the 911 operator about Mike's being in the bathtub. Additionally, there was a twelve-minute delay between the time that Williams called his grandmother and when Chagoya-Williams called 911 despite her admitting

22

in the termination proceeding that she had been taught through the Department's services to call 911 right away in an emergency. Regarding the 911 call, the operator remembered that although she provided instructions on how the parents should perform CPR, she never heard either parent counting the breaths or compressions as instructed. Further, a couple of days after the incident, Chagoya-Williams called her older sister from an unknown phone number to ask her sister to tell the Department and the police that Mike was "a rough boy" even though he was not. From this evidence, it would be reasonable for the jury to infer that Chagoya-Williams had engaged in attempts to conceal incriminating evidence by helping to remove evidence from Mike's body, delaying calling 911 to conceal evidence, and asking her sister to lie to the police. *See id.*

In addition, before any report on Mike's injuries or cause of death had been made, she suggested to her sister that Mike may have had brittle bone disease even though Mike did not have the condition, and Williams and she both blocked her sister from their social media accounts after she expressed disbelief regarding their account of what happened. Although Chagoya-Williams's stepfather explained that the fear was primarily directed at Williams, he testified that Mike exhibited fear of leaving with Williams and her when they arrived at his house to pick Mike up. Moreover, witnesses testified that Mike did not have bruising or other injuries while not in Chagoya-Williams's custody, and her phone had images and videos showing injuries to Mike after she obtained custody of him again and before his death. During that time, her phone was used to perform internet searches concerning injuries like those seen on the photos and videos and to search for ways to "induce sleep paralysis." The medical testimony also established that Mike had fractures that were in different states of healing, meaning that the injuries had been occurring over a period and not just on the day of Mike's death. When discussing the events leading up to Mike's removal, Chagoya-Williams described the actions of

23

the treating medical personnel identifying the significant injuries and of the Department employees' investigating the cause of those injuries as a scam to make money for the Department and the hospital. Additionally, Chagoya-Williams provided explanations for Mike's bruising and other injuries and made excuses to keep family members from seeing the children in person, and the jury could have reasonably inferred that she was attempting to cover up the abuse of the children. From this evidence, the jury could have reasonably inferred from these actions that she had "an understanding and common design to do the prohibited act." *Hooper*, 214 S.W.3d at 13 (quoting *Cordova*, 698 S.W.2d at 111).

Additionally, although some witnesses testified to her becoming emotional, multiple witnesses testified that she seemed to have little to no reaction to Mike's death, and her "Eh" text response to Williams on the day after Mike's death likewise indicated a lack of a strong emotional reaction about the events. Similarly, her older sister testified that she made unusual statements after Mike's death and was focused on what her neighbors might say to her. *Cf. Stevens v. State*, 234 S.W.3d 748, 778-79 (Tex. App.—Fort Worth 2007, no pet.) (determining that evidence was sufficient to support conviction for capital murder of two-year old and noting in analysis that defendant "showed a lack of emotion" on day of death and told individuals cause of death of child even though it had not yet been established by medical professionals who treated child, that injuries to child began when defendant began babysitting child and ceased when child was away on vacation, and that medical testimony ruled out disease or accident as cause of injuries). Finally, although Chagoya-Williams's mother testified that Chagoya-Williams did not become aware that Williams had fathered another child with another woman until after Mike died, the jury could have disregarded that portion of the mother's testimony and inferred from the remainder of her testimony and the testimony of one of the

24

detectives that Chagoya-Williams discovered the affair and had a motive to hurt Williams's children. *See Reaves v. State*, 970 S.W.2d 111, 119 (Tex. App.—Dallas 1998, no pet.) (explaining that proof of extramarital affair was relevant in murder case); *see also Keith*, 2017 WL 6210865, at *6 (explaining that defendant had motive to harm child after his wife had affair with another man).

Considering this evidence and given our standard of review, we conclude that the evidence was sufficient to show that Chagoya-Williams either intentionally or knowingly killed Mike herself or was a party to the offense. Accordingly, we overrule her third issue on appeal.

**Motion to Quash**

*Alleged Omission in Indictment Regarding Manner and Means*

In her first issue on appeal, Chagoya-Williams contends that the trial court erred by denying her motion to quash the indictment because it "did not include any allegation of a manner and means." The indictment alleged the following:

> On or about the 4th day of July, 2018, in Hays County, Texas, the Defendant, Dazrine Ruth Chagoya-Williams, did then and there intentionally and knowingly cause the death of an individual, [Mike], an individual younger than 10 years of age, by compressing or squeezing[.]

In her motion to quash, Chagoya-Williams asserted that the indictment was vague because it did not sufficiently describe the alleged criminal conduct. Further, the motion contended that if the State intended to argue that she was liable under the law of parties, the indictment should be quashed because it did not include any language informing her of that possibility. After considering the motion and the parties' arguments during a hearing, the trial court denied the motion.

On appeal, Chagoya-Williams acknowledges that the indictment alleged that she caused Mike's death "by compressing and squeezing," but she asserts that the indictment does not allege "compression of what body part, how that action caused the death," or when the compression or squeezing occurred. Chagoya-Williams argues that the indictment did not give her the constitutionally required adequate notice or charge the crime with sufficient particularity, that a defendant should not be required to anticipate any facts the State might hypothetically seek to establish or speculate about the acts for which she is charged, and that the State cannot just rely on a laundry list of criminal acts and let the jury decide which it believes the defendant committed. For example, she asserts that the State could have alleged death by occlusion, which would have provided more clarity. Further, she contends that it does not matter whether she was otherwise aware of the nature of the charged offense because the face of the indictment must provide that information in a plain and intelligible manner. Moreover, she argues that although indictments that track the relevant statutory language can provide sufficient notice, they do so only when the statutory language itself includes the particularized alleged conduct at issue. For these reasons, she contends that the trial court erred by denying her motion to quash.[4]

"The sufficiency of a charging instrument presents a question of law." *Smith v. State*, 309 S.W.3d 10, 13 (Tex. Crim. App. 2010). Accordingly, appellate courts review a trial court's ruling on a motion to quash under a de novo standard. *Id.* at 13-14; *see also State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004) (applying de novo review to trial court's

---

[4] In her brief, Chagoya-Williams mentions that the indictment did not allege an act clearly dangerous to human life. Although committing an act clearly dangerous to human life can constitute murder, *see* Tex. Penal Code § 19.02(b)(2), it cannot serve as a basis for capital murder, *see id.* §§ 19.03 (providing that person commits capital murder if he commits murder as defined by subsection 19.02(b)(1) and if one of delineated circumstances is met), .02(b)(1) (explaining that person commits murder if he intentionally or knowingly causes death of individual). Accordingly, it is unclear how the alleged omission could have been error.

26

decision to quash indictment because issue was question of law and because resolution of issue did not depend on "credibility and demeanor of a witness"). "The trial court's ruling should be upheld if it is correct under any theory of law applicable to the case." *State v. Zuniga*, 512 S.W.3d 902, 906 (Tex. Crim. App. 2017).

Criminal defendants have the constitutional right "to be informed of the nature and cause of the accusation" against them. U.S. Const. amend. VI; *see* Tex. Const. art. 1, § 10. Consequently, indictments "must be specific enough to inform the accused of the nature of the accusation against him so that he may prepare a defense." *Moff*, 154 S.W.3d at 601. An indictment must set out an offense "in plain and intelligible words." Tex. Code Crim. Proc. art. 21.02. Further, "[e]verything should be stated in an indictment which is necessary to be proved." *Id.* art. 21.03. "The certainty required in an indictment is such that will enable the accused to plead the judgment that may be given upon it in bar of any prosecution for the same offense." *Id.* art. 21.04. An indictment is sufficient if it "charges the commission of the offense in ordinary and concise language in such a manner as to enable a person of common understanding to know what is meant, and with that degree of certainty that will give the defendant notice of the particular offense with which he is charged, and enable the court, on conviction, to pronounce the proper judgment." *Id.* art. 21.11. An indictment is not insufficient if "the information requested in a motion to quash is essentially evidentiary in nature rather than being required for purposes of notice and bar." *Moreno v. State*, 721 S.W.2d 295, 300 (Tex. Crim. App. 1986).

Additionally, the due-process notice "requirement may be satisfied by means other than the language in the charging instrument." *Smith v. State*, 297 S.W.3d 260, 267 (Tex. Crim. App. 2009); *see Kellar v. State*, 108 S.W.3d 311, 313 (Tex. Crim. App. 2003); *see also*

27

*Moff*, 154 S.W.3d at 603 (noting that specific acts need not "be listed in the indictment, as long as they are provided by some other means"). In fact, in some circumstances "[t]he State may satisfy this obligation through pre-trial discovery." *Hines v. State*, 608 S.W.3d 354, 371 (Tex. App.—Houston [1st Dist.] 2020, no pet.). "When a motion to quash is overruled, a defendant suffers no harm unless he did not, in fact, receive notice of the State's theory against which he would have to defend." *Smith*, 297 S.W.3d at 267; *see also* Tex. Code Crim. Proc. art. 21.19 (providing that "[a]n indictment shall not be held insufficient, nor shall the trial, judgment or other proceedings thereon be affected, by reason of any defect of form which does not prejudice the substantial rights of the defendant").

Consistent with the governing statutes, the indictment alleged that Chagoya-Williams committed capital murder by intentionally and knowingly causing the death of an individual who was younger than ten years old at the time of his death. *See* Tex. Penal Code §§ 19.02(b)(1), .03(a)(8); *see also Hughitt v. State*, 583 S.W.3d 623, 626 (Tex. Crim. App. 2019) (explaining that "[g]enerally, an indictment that tracks the language of the applicable statute will satisfy constitutional and statutory requirements"). *But see Moff*, 154 S.W.3d at 602 (identifying circumstances in which tracking statutory language may be insufficient); *State v. Peterson*, 612 S.W.3d 508, 512 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd) (same). The indictment further identified the victim, alleged that Mike was killed through "compressing or squeezing," and specified the date of the offense. *Cf. Wilkerson v. State*, No. 05-22-00216-CR, 2023 WL 312946, at *3 (Tex. App.—Dallas Jan. 19, 2023, pet. ref'd) (mem. op., not designated for publication) (concluding that indictment alleging that defendant grabbed and squeezed victim's neck by "an arm" was sufficient to provide notice).

Even if the indictment did not provide sufficient information concerning the "compressing or squeezing," the State's theory was identified through subsequent disclosures and acknowledged by Chagoya-Williams. Approximately three years before trial, she filed a motion seeking trial transcripts from the termination proceeding in which her parental rights to Denise were terminated. A few months later, the trial court granted the request. In its order, the trial court explained that "[t]he facts and circumstances" related to the termination proceeding were "intricately linked to the facts and circumstances" of the criminal charges against her and that she and other individuals who would likely be called as witnesses in the criminal case had already provided sworn testimony in the termination proceeding, and the trial court required the State to provide transcripts of the testimony from Williams, her, and other witnesses who testified during the termination proceeding. *See* Tex. Code Crim. Proc. art. 39.14. Six months before trial and after having reviewed the transcripts from the termination proceeding, Chagoya-Williams filed an ex parte motion for expert assistance. In that motion, she explained that her attorneys were "intimately familiar with the strategy used by the State in the associated" termination proceeding. Specifically, she stated that "the State relied heavily on pictures showing bruising and fractures to the young children to substantiate it[]s claim that the fractures could only have been caused by either blunt force trauma or compression of the chest area to suffocate the deceased child."

Around that same time, she filed a motion to obtain copies of the transcripts from Williams's trial, and the trial court granted that request nearly five months before trial and before she filed her motion to quash, ordering the State to produce the sworn testimony of the witnesses from Williams's trial that were expected to testify at her trial. Like this case, the State's theory in Williams's trial was that Mike was killed by his chest being compressed to where he could no

29

longer get oxygen to his brain and that the compression was caused by someone wrapping their hands around his chest and squeezing hard, and witnesses testified to that effect, including the same pathologist who was a witness in this case. *See Williams v. State*, No. 03-21-00536-CR, 2023 WL 4214960, at *2-3, *6 (Tex. App.—Austin June 28, 2023, no pet.) (mem. op., not designated for publication). Further, the State explained during the hearing on the motion to quash that Chagoya-Williams had "access to the full discovery," including the offense reports and medical records describing how Mike died.

On this record, we must conclude that the indictment and the additional information disclosed by the State provided Chagoya-Williams with notice that was specific enough to allow her to investigate the allegations against her and establish a defense. *See Smith*, 297 S.W.3d at 267 (determining that defendant was not harmed where record showed that he "had actual notice of the capital charge upon which the State was basing its allegations"); *Moff*, 154 S.W.3d at 602 (noting that point of providing notice is to allow defendant "to investigate the allegations against him and establish a defense").

For these reasons, we conclude that the trial court did not err by denying the motion to quash and, therefore, overrule Chagoya-Williams's first issue on appeal.

*Alleged Omission Regarding Culpability as Party to Offense*

In her second issue on appeal, Chagoya-Williams contends that the trial court erred by denying her motion to quash because the indictment did not provide notice "regarding an allegation or description of [her] conduct as a party." More specifically, she argues that the indictment failed to set out how she aided or abetted in the commission of the offense or list any behavior that she omitted that could have resulted in her being held criminally liable as a party.

30

However, "the law of parties need not be pled in the indictment." *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005); *see Marable v. State*, 85 S.W.3d 287, 287 (Tex. Crim. App. 2002); *Tate v. State*, 811 S.W.2d 607, 607 n.3 (Tex. Crim. App. 1991). "[T]he facts which make a person criminally responsible for the conduct of another are *evidentiary*," which is why the law of parties need not be pleaded. *Popp v. State*, 634 S.W.3d 375, 386 (Tex. App.—El Paso 2021, pet. ref'd) (quoting *Swope v. State*, 805 S.W.2d 442, 444-45 (Tex. Crim. App. 1991)); *see also id.* at 387 (observing that "any acts and omissions that might render an accused culpable as a *party* are subsumed in the acts and omissions that form his alleged culpability as a *princip[a]l[]*");Tex. Penal Code § 7.01(c) (abolishing distinction between "accomplices and principals" and explaining that "each party to an offense may be charged and convicted without alleging that he acted as a principal or accomplice").

Accordingly, a "party to an offense may be charged with the offense without alleging the facts which make the defendant a party . . . ." *Pitts v. State*, 569 S.W.2d 898, 900 (Tex. Crim. App. 1978). Further, "[i]f the evidence supports" an instruction "on the law of parties, . . . the court may" include the instruction "even though there is no such allegation in the indictment." *Id.*; *see also Boston v. State*, 373 S.W.3d 832, 837 (Tex. App.—Austin 2012) (explaining that accused may be properly convicted as party to offense even if indictment did not charge him as party), *aff'd*, 410 S.W.3d 321 (Tex. Crim. App. 2013). Moreover, to the extent that Chagoya-Williams again asserts in this issue that she was not given the required notice, we again determine that the indictment and other disclosures provided her with the constitutionally required notice.

For these reasons, we conclude that the trial court did not err by denying the motion to quash and, therefore, overrule Chagoya-Williams's second issue on appeal. *See*

31

*Williams v. State*, No. 02-03-00313-CR, 2005 WL 555250, at \*1 (Tex. App.—Fort Worth Mar. 10, 2005, pet. ref'd) (mem. op., not designated for publication) (overruling issue that trial court erred by denying defendant's motion to quash on ground that indictment failed to allege that defendant was culpable under law of parties).

## CONCLUSION

Having overruled all of Chagoya-Williams's issues on appeal, we affirm the trial court's judgment of conviction.

_____

Thomas J. Baker, Justice

Before Justices Baker, Triana, and Smith

Affirmed

Filed: October 19, 2023

Do Not Publish